#4
IFP

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID R. KAUFFMAN

     *Plaintiff,*

-v-

PENNSYLVANIA DEPT. OF CORRECTIONS,
*sued in its individual and official capacity,* and
LAURELL HARRY, DORINA VARNER,
KERI MOORE, RANDY IRWIN, ZACHARY
MOSLAK, JAMIE WALKER, IAN GUSTAFSON,
JOHN BLICHA, DALTON LESKO, KORBAN
MOHONEY, J. ALEXANDER, A. EISENMAN,
WEILAND, BELL, LOWE, C.O. MOORE, YOUNT,
MOWERY, BULERS, BAUER, JOHN DOE #1,
JOHN DOE #2, SPENCER, STRICK, CRYSTAL,
WATSON, JOHN DOE #3, COLLINS, MINICH,
TYLER LAVER, JOHN DOE #4, FREDRICK,
JOHN DOE #5, MCGILL, BURKHART, CARBON,
JOHN DOE #6, RICHARDS, CROSE, DEANGELO,
REDDINGER, MARSHAL, D. MUNTZ, SNYDER,
JANA JORDAN, K. SMITH, *sued in their individual
capacities.*

     *Defendants.*

Case no. 1:25-CV-100

Hon. Richard Lanzillo

CIVIL RIGHTS COMPLAINT (§1983)

Trial by Jury Demanded

RECEIVED

APR 1 5 2025

CLERK, U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT
OF PENNSYLVANIA

*Introduction*

1. This is a civil rights action filed by David Kauffman ("Plaintiff"), for damages under 42 § 1983 alleging misuse of force, denial of medical care, and retaliation in violation of the Eighth Amendment and First Amendment to the United States Constitution; confinement in segregation in violation of the Due Process Clause of the Fourteenth Amendment and

the right to be free from retaliation in violation of the First Amendment to the United States Constitution; an abusive strip search practice in violation of the First Amendment, Fourth Amendment, and Eighth Amendment to the United States Constitution; theft of property and legal materials with no meaningful post-deprivation remedy in violation of the First Amendment, Fourth Amendment, and Fourteenth Amendment to the United States Constitution; an illegal search of legal mail in violation of the First Amendment and Fourth Amendment to the United States Constitution; and substantial burdens to religious practice in violation of the First Amendment to the United States Constitution and Religious Land Use and Institutional Persons Act, 42 U.S.C. § 2000cc. Plaintiff also alleges the torts of intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and assault and battery under the law of Pennsylvania. Overall, plaintiff alleges that all the defendants carried out or allowed an overarching campaign of harassment and unprovoked violence as retaliation for plaintiff's engagement in constitutionally protected conduct—treatment that resulted from the supervisory defendants' unconstitutional policies, practices, and customs.

*Jurisdiction*

2. The Court has jurisdiction over plaintiff's claims of violation of federal constitutional rights under 42 U.S.C. § 1331(1) and 1343.

3. The Court has supplemental jurisdiction over plaintiff's state law tort claims under 28 U.S.C. § 1367.

4. The Court has jurisdiction over plaintiff's Religious Land Use and Institutional Persons Act claims under 42 U.S.C. § 2000cc.

*Venue*

5.  The United States District Court for the Western District of Pennsylvania is the appropriate venue for trial pursuant to 28 U.S.C. § 1391(b)(2); the County of Forest, Pennsylvania, is where the events complained of have occurred.

*Previous Lawsuits*

6.  Based upon separate facts and events, plaintiff has filed a prior civil rights action, Case No. 3:23-cv-239-KAP.

*Parties*

7.  Plaintiff, David R. Kauffman, was incarcerated at State Correctional Institution Forest ("SCI-Forest"), PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239, during the events described in this complaint, and was recently released from prison. As such, plaintiff is no longer considered a prisoner under the Prison Litigation Reform Act ("PLRA"). Plaintiff's current address is 11 Forever Lane, Paradise, Pennsylvania 17562.

8.  Defendant Pennsylvania Dept. of Corrections ("PADOC") is a state agency responsible for the confinement, care, and rehabilitation of incarcerated individuals in facilities across Pennsylvania. Its headquarters is at 1920 Technology Parkway, Mechanicsburg, Pennsylvania 17050. It is sued in its individual and official capacity.

9.  Defendants Keri Moore and Dorina Varner are the chief grievance coordinators of PADOC, 1920 Technology Parkway, Mechanicsburg, Pennsylvania 17050. They are sued in their individual capacities.

10. Defendant Zachary Moslak is the chief hearing examiner of the PADOC, 1920 Technology Parkway, Mechanicsburg, Pennsylvania 17050. He is sued in his individual capacity.

11. Defendant Randy Irwin is the superintendent of SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. He is sued in his individual capacity.

12. Defendants Jamie Walker, Lowe, and Bell are correctional lieutenants in charge of the Restricted Housing Unit (RHU) at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. They are sued in their individual capacities.

13. Defendants Dalton Lesko and Fredrick are correctional sergeants in charge of the RHU at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. They are sued in their individual capacities.

14. Defendant Ian Gustafson is the deputy superintendent of centralized services at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. He is sued in his individual capacity.

15. Defendant John Blicha is the deputy superintendent of facility management at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. He is sued in his individual capacity.

16. Defendant J. Alexander is the major of unit management at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. She is sued in her individual capacity.

17. Defendant A. Eisenman is the correctional classification program manager at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. She is sued in her individual capacity.

18. Defendant Weiland is the correctional captain and unit manager in charge of the RHU at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. He is sued in his individual capacity.

19. Defendant Reddinger is a correctional sergeant at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. He is sued in his individual capacity.

20. Defendants Collins and D. Muntz are hearing examiners at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. They are sued in their individual capacities.

21. Defendants Korban Mohoney, C.O. Moore, Yount, Mowery, Bulers, Bauer, Spencer, Minich, Burkhart, Carbon, Richards, Crose, DeAngelo, and Marshal are correctional officers (C.O.) at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. They are sued in their individual capacities.

22. Defendants John Doe #1, John Doe #2, John Doe #4, John Doe #5, and John Doe #6 are correctional officers employed at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239, and whose names are presently unknown to plaintiff. They are sued in their individual capacities.

23. Defendants Crystal, Watson, and McGill are registered nurses (RN) employed at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. They are sued in their individual capacities.

24. Defendants Strick and Snyder are doctors contracted through a private company, Correct Care Solutions, to provide medical care to prisoners at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. They are sued in their individual capacities.

25. Defendant John Doe #3 is an X-ray technician employed at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239, and whose name is presently unknown to plaintiff. He is sued in his individual capacity.

26. Defendants K. Smith and Jana Jordan are the corrections health care administrators at SCI-Forest, PO Box 945, 286 Woodland Drive, Marienville, Pennsylvania 16239. They are sued in their individual capacities.

27. Defendant Tyler Laver is a state trooper employed at the Marienville State Police Barracks, 4956 Rt. 899, Marienville, Pennsylvania 16329. He is sued in his individual capacity.

28. All the defendants have acted, and continue to act, under color of state law at all times relevant to this complaint.

*Facts*

29. At 9:25 a.m. on April 25, 2023, plaintiff had a Prison Rape Elimination Act ("PREA") counseling session scheduled with PREA Counselor Trina because he had sought PREA counseling for trauma sustained as a result of the Restricted Housing Unit ("RHU") guards' prior sexual abuse of plaintiff.

30. At 9:25 a.m. that day, a correctional officer ("C.O.") asked plaintiff over his in-cell telecom, "Why are you going to a teleconference?"

31. Over the telecom plaintiff replied, "It is probably PREA counseling. I signed up for PREA counseling because I am traumatized from staffs' abuse of me."

32. At 9:26 a.m. defendants Mowery and Yount came to plaintiff's cell door and began to conduct a strip search of plaintiff.

33. During this strip search, one of the defendants said: "We are going to beat your ass when you get back from this teleconference."

34. Defendants Mowery and Yount then handcuffed plaintiff in the front, opened his cell door, and attached a restraint belt to his handcuffs.

35. On the walk to the teleconference room (where the PREA counseling was to be conducted), defendant Yount asked plaintiff: "Are you going to report abuse?"

36. Fearing retaliation, plaintiff replied, "No."

37. Defendant Yount said, "Yeah right. We are beating you."

38. Plaintiff said, "OK."

39. Then defendant Mowery began to get in plaintiff's face and said, "PREA will not save you."

40. Defendants Mowery and Yount then took plaintiff to the hallway, where they met a C.O. (whom plaintiff cannot identify) and placed shackles on plaintiff's ankles.

41. Defendants Mowery, Yount, and the unidentified C.O. then began to escort plaintiff to the teleconference room for PREA counseling.

42. During this escort defendant Mowery asked either defendant Yount and/or the unidentified C.O., "You think we can give him a misconduct for talking to a PREA counselor?" and then left.

43. Defendant Yount and the unidentified C.O. put plaintiff in the PREA counseling room, and defendant Yount said, "Remember what I said," referring to his prior threats to beat plaintiff.

44. Moments later, defendants Mowery and Yount came to the PREA counseling room to take plaintiff—who was still restrained with handcuffs, a restraint belt, and shackles—back to the RHU.

45. Defendants Mowery and Yount began to escort plaintiff back to the RHU in order to carry out their premeditated plan to beat and sexually abuse plaintiff in the RHU.

46. In the hallway of the of the PREA counseling room, plaintiff informed a female C.O. (whom plaintiff cannot identify), "These officers are going to hurt me. I did not speak to a PREA counselor."

47. Hearing that, defendants Yount and Mowery violently and needlessly grabbed plaintiff's arms, and dragged and pushed him back to the RHU.

48. Plaintiff did not threaten or resist the officers in any fashion during the escort, although he repeatedly told them that the violence they intended to inflict on him was "fucked up."

49. During the escort defendant Mowery repeatedly yelled in plaintiff's face, saying that he and defendant Yount were going to beat and rape plaintiff and that they had other officers waiting to participate.

50. Plaintiff said: "This is fucked up. I will file another PREA. Leave me alone."

51. When defendants Mowery and Yount and plaintiff—plaintiff believes that at some point defendants John Doe #1, John Doe #2, Mohoney, Walker, Bulers, Bauer, and Spencer began to follow them—arrived at plaintiff's RHU cell, plaintiff said, "I am going in my cell now," and tried to escape the retaliation by entering his cell, which was equipped with an in-cell camera.

52. In return defendant Mowery grabbed plaintiff by his neck, pried him from his cell door (ripping plaintiff's state-issued t-shirt), and threw him with full force onto the ground, causing a severe head, neck, and brain injury; a broken right elbow; and whiplash to his head and neck.

53. As plaintiff lay on the ground, defendants Bulers, Mowery, Yount, John Doe #1, John Doe #2, Bauer, and Walker (plaintiff believes that defendants Spencer and Mohoney were there, too) jumped on plaintiff's back; put a filthy spit mask on his face for no reason

save harassment; repeatedly punched his head and face; pounded his head and face into the ground; kicked, kneed, and punched his ribs; or otherwise witnessed this abuse but did not intervene.

54. During this assault one of the defendants said, "You report anything to those organizations then we will kill your family."

55. During this assault one of the defendants rubbed his hands on plaintiff's genitals, put a finger in plaintiff's rectum, and said, "I'll rape you here in the day room."

56. This humiliating, inhumane treatment was done in the day room, while thirty-six other inmates watched and yelled from their cell doors, "All of you [the defendants] have been provoking that man [plaintiff] since you pulled him from his cell! Get off him!"

57. During these events plaintiff did not resist or threaten the officers in any fashion or break any prison rules: plaintiff was still restrained with handcuffs, a restraint belt, and shackles; neither resisting nor speaking; but seriously injured.

58. Defendants Mowery, Yount, Bulers, Bauer, John Doe #1, John Doe #2, Spencer, and Mohoney have repeatedly engaged in excessive force against inmates in the past.

59. Defendants Harry, Moore, Varner, Irwin, Walker, Bell, Fredrick, and Lesko have been placed on notice of the abusive conduct of defendants Mowery, Yount, Bulers, Bauer, John Doe #1, John Doe #2, Spencer, and Mohoney by a number of grievances and complaints over many months, but have failed to take disciplinary action against them or otherwise to control their behavior.

*Deliberate Indifference*

60. After the above-described assault, plaintiff was taken to the medical triage, where defendants Watson and Crystal denied him medical care for the injuries sustained from

the beating—that is, brain damage, whiplash, a broken right elbow and left wrist, a swollen face, sore ankles, a terribly sore and painful neck and head injury, numbness to his fingers, bleeding wrists, sore ribs, migraine headaches, and severe pain.

61. During this grossly negligent examination of plaintiff, plaintiff informed defendant Watson of his broken bones and of extreme pain in his wrists, ankles, ribs, and face; plaintiff also screamed out in agonizing pain when defendant Watson touched his left wrist and right elbow.

62. Defendants Watson and Crystal provided no diagnostic testing, no referral to a doctor, no hospitalization, no pain and migraine medication, no bandages or antibiotic ointment.

63. Instead, defendant Watson merely told plaintiff to "submit a sick call request," and defendant Crystal left the room.

*Retaliation*

64. In the medical triage plaintiff reported the officers' abusive retaliation to defendant Walker, and then defendant Walker lied on camera accusing plaintiff of threatening him in retaliation for reporting the officers' abuse.

65. At 4:37 p.m. on the evening of April 25, 2023, plaintiff was given a fabricated misconduct report written by defendant Mowery, wherein defendant Mowery accused plaintiff of being verbally aggressive, threatening staff, and shoulder shoving him multiple times.

66. Defendant Mowery fabricated four serious, stigmatic, retaliatory misconduct charges against plaintiff—and defendant Mohoney listed himself on the misconduct report as having witnessed plaintiff's committing these false misconduct charges: Class 1, #1 Assault on staff; Class 1, #15 Threatening an employee or their family with bodily harm;

Class 1, #33 Using abusive, obscene, or inappropriate language to or about an employee; and Class 1, #35 Refusing to obey an order.

67. In this misconduct report, neither defendant Mowery nor defendant Mohoney provided any explanation to account for the charge of "refusing to obey an order."

### Due Process, Retaliation

68. On April 28, 2023, defendant Yount, accompanied by another officer, came to plaintiff's cell door, to take him to the disciplinary hearing with defendant Collins concerning the fabricated misconduct report described above.

69. Through plaintiff's cell wicket plaintiff gave defendant Yount an "inmate version form," wherein he described the officers' retaliation, including their sexual abuse and physical abuse and the retaliatory misconduct charges. (DC-ADM 801, Section 3.C., provides that "[t]he inmate may submit a written version or may orally present his/her version that shall be summarized as part of the hearing record.").

70. Defendant Yount snatched the inmate version form from plaintiff's hands; read plaintiff's abuse allegations mentioned therein and directed toward defendant Yount, among others; and stated, "I am going to throw this in the fucking trash."

71. Plaintiff was then taken to the disciplinary hearing with defendant Collins, and the inmate version form was given to defendant Minich and placed on the table in front of plaintiff.

72. At this hearing plaintiff recounted the reprisal—the sexual abuse and physical abuse and the fabricated misconduct charges which had occurred on April 25, 2023—exactly how he described the event in the inmate version form and in the present complaint.

73. At this disciplinary hearing plaintiff informed defendant Collins that once he was pulled from his cell for PREA counseling, the officers were providing retaliatory threats to him;

that the officers' crazy retaliation persisted during the escort back to the RHU; that he pleaded to be left alone; that when he tried to escape into his cell, the officers grabbed his neck, threw him on the ground, beat him, rubbed his genitals, and put a finger in his rectum while sexually threatening him; and that he filed a PREA allegation against them for this.

74. At this disciplinary hearing plaintiff wore the ripped t-shirt, conveyed the rips on the collar, and testified: "This is the shirt the officers ripped when I was grabbed by the neck and thrown on the ground while trying to escape into my cell. The rips show that I did not 'push back and shoulder shove Mowery,' as he fabricated in the misconduct report. Rather, the force of his prying me from my cell caused my shirt to rip at the collar."

75. In response, defendant Collins accused plaintiff of ripping the t-shirt himself and then presenting it as false evidence.

76. Plaintiff contended: "I would not waste $6.00 on ripping my own t-shirt. Review the video. Maybe there is a blind spot or something. But I know for a fact it will not show that I pushed the officer."

77. At this disciplinary hearing plaintiff inquired as to how his inmate version form would make it into the record considering that the hearing was being conducted via teleconference.

78. Defendant Collins said that the officers would take care of the inmate version form and ordered plaintiff to sign a Form DC-141, Part 2(D), Waiver of Disciplinary Procedures, to waive the disciplinary hearing until he reviewed the video of the incident. (DC-ADM 801, Section 3.A.2., provides that "... The inmate shall be afforded at least 24 hours to prepare for the hearing from the date and time that the misconduct report is served. The

inmate may elect to waive the 24 hours preparation in writing by signing the DC-141, Part 2(D), Waiver of Disciplinary Procedures. The hearing examiner may be involved in the scheduling process where a case is continued or postponed." In practice, for an inmate to have the Hearing Examiner review video, an inmate must sign a Part 2(D) form.).

79. At this disciplinary hearing defendants Mowery, Yount, Mohoney had an opportunity to testify against plaintiff.

80. However, defendants Mowery, Yount, and Mohoney did not testify against plaintiff at this disciplinary hearing; instead, defendants Mowery and Yount eavesdropped from outside the hearing room.

81. Defendant Yount then escorted plaintiff to his RHU cell, and during this escort he— accompanied by another officer—gripped plaintiff's arms in a threatening fashion and said, "Collins works for us. This RHU time is indefinite."

82. During this escort defendant Mowery chased plaintiff back to his cell screaming, "I will come in your cell and hang you, nigger," because defendant Mowery had heard plaintiff's testimony against him.

83. Soon after plaintiff was put in his cell, defendant Minich came to his cell door and sneakily slid through the side of plaintiff's cell door both the DC-141, Part 2(D), Waiver of Disciplinary Procedures Form and plaintiff's inmate version form.

84. Plaintiff then signed the Part 2(D) Waiver Form and told defendant Munich to give the inmate version form to defendant Collins and to the deputy superintendent per the policy.

85. Then defendant Minich took both the Part 2(D) Waiver Form and plaintiff's inmate version form from plaintiff's cell door and said, "Nah. I am discarding it. Collins told me to get rid of it and to keep it out of the record."

86. Plaintiff then filed a grievance and grievance appeals complaining about the retaliatory destruction of the inmate version form by defendants Yount, Collins, and Minich.

87. Defendants Varner, Moore, Irwin, and Walker denied that grievance and those grievance appeals and failed to disciple defendants Yount, Collins, and Munich or otherwise prevent further retaliation in the RHU.

*Deliberate Indifference, Retaliation*

88. On April 30, 2023, plaintiff submitted a sick call request, requesting diagnostic testing for brain damage; X-rays for his broken right elbow, left wrist, and ribs; pain and migraine medication; and a psychiatric evaluation for increased PTSD and night terrors—injuries resulting from the above-described assault of plaintiff.

89. In this sick call request, plaintiff also complained of "chest pain similar to a heart attack," which was later found out to be caused by Hyperthyroidism.

90. That evening, Registered Nurse ("RN") Faust checked plaintiff's blood pressure and said that defendant Strick would follow up with him shortly to order an EKG.

91. In medical records, however, RN Faust said she assessed his "shoulders, arm, chest, fingers, and wrists"—but RN Faust did none of that.

92. On May 1, 2023, defendant Strick came to plaintiff's cell door, and plaintiff requested diagnostic testing, medication, and X-rays for the injuries described above. Plaintiff also complained of chest and heart pain associated with Hyperthyroidism and requested testing be done to determine the cause of the chest and heart pain.

93. From outside plaintiff's closed cell door, defendant Strick looked at his right elbow and said: "Jesus Christ! What happened to your elbow? You are probably right. It looks broken."

94. When plaintiff informed defendant Strick that the injuries resulted from a savage beating by the officers, however, defendant Strick stepped away from his cell door and said, "Oh OK. I think you will be fine," and left.

95. To cover-up the officers' abusive retaliation and to punish the plaintiff for reporting the abuse, defendant Strick then returned to her office and fabricated medical records saying that plaintiff had injured himself by falling and hitting his head and elbow in the cell, that he could rotate his arm, and that there was no deformity.

96. To conceal the extent of the injuries sustained from the abuse, defendant Strick maliciously and sadistically ordered an incorrect X-ray for plaintiff's left elbow instead of his right elbow.

97. Defendant Strick provided no medical care whatsoever and failed to order any testing— including lab work or an EKG—for plaintiff's symptoms of Hyperthyroidism.

*Deliberate Indifference*

98. On May 2, 2023, defendant John Doe #3 X-rayed plaintiff's left elbow, and when plaintiff said his right elbow was broken, not the left one, defendant John Doe #3 said, "I cannot change the X-ray Dr. Strick ordered. Submit another sick call request."

99. Defendant John Doe #3 provided no medical care and no correct X-rays.

100. Plaintiff then filed a grievance concerning this denial of medical care for the aforementioned injuries. In this grievance and the grievance appeals, plaintiff informed defendants Irwin, Varner, Moore, and K. Smith that defendants Strick, Watson, and Crystal were failing to provide medical care for these serious medical needs.

101.    Through all levels of the grievance process, defendants Irwin, Varner, Moore, and K. Smith denied the grievance and all requested relief, including plaintiff's request for medical care.

*Retaliation, Due Process, Unlawful Search and Seizure, Conditions of Confinement*

102.    On May 11, 2023, plaintiff was pulled from his RHU cell and taken to the mini law library in the RHU, to speak to PREA Lieutenant Friedline and defendant Laver, who both were nonchalantly chatting with the RHU officers as if they were friends with each other for years.

103.    Defendant Laver and PREA Lieutenant Friedline were there to speak with plaintiff about the PREA allegation he had filed against defendants Mowery, Yount, Mohoney, Bulers, Bauer, John Doe #1, John Doe #2, Spencer, and Walker regarding the retaliatory abuse that occurred on April 25, 2023.

104.    Plaintiff recounted the aforementioned reprisal and informed defendant Laver: "You should criminally charge these officers for abusing me. When anyone else assaults another person he gets criminal charges. It should be no different for these officers. They have inflicted serious injuries which the medical staff here is intentionally refusing to treat, and I will be filing a 1983 lawsuit against the officers."

105.    In response defendant Laver quipped: "So what if I tell the prosecutors that you are just a liar. I could have criminal charges pressed on you. You are a convicted felon. You do not call the shots."

106.    According to a grievance response written by defendant Irwin, defendant Laver did then fabricate his police report—in an attempt to discredit plaintiff's character in this court and to prevent criminal charges from being imposed on defendants Mowery, Yount,

Mohoney, Bulers, Bauer, John Doe #1, John Doe #2, Spencer, and Walker and to interfere with this then-forthcoming lawsuit—by reporting that plaintiff's allegations against the officers were "unfounded," by reporting that plaintiff "changed his story multiple times," and by reporting that plaintiff "provided false information asserting his alleged injuries went untreated by medical."

107.    Defendant Laver maliciously and sadistically fabricated said police report to conceal the abusive retaliation and refused to carry out his legal duty to impose criminal charges on the officers—as a form of retaliation against plaintiff for reporting the officers' abuse, for demanding that criminal charges be imposed on the officers, and for informing defendant Laver about this then-forthcoming 1983 lawsuit.

108.    Following this interaction with defendant Laver on May 11, 2023, plaintiff was taken back to his RHU cell by defendants Spencer and John Doe #4.

109.    When plaintiff—accompanied by defendants Spencer and John Doe #4—entered the RHU pod, there was a garbage can pulled up to his cell door, and defendant Bauer was in his cell trashing and destroying his property.

110.    Plaintiff said: "Hey, what are you doing? Why are you trashing my property?"

111.    Plaintiff and defendants Spencer and John Doe #4 remained outside plaintiff's cell watching defendant Bauer's trashing and destroying the property, and defendants Spencer and John Doe #4 did not intervene.

112.    Instead, defendant Spencer informed plaintiff that defendant Bauer was doing a "snitch special," referring to the retaliatory tactics the officers use against prisoners who report staff abuse of prisoners in the RHU.

113.     From inside plaintiff's cell, defendant Bauer told plaintiff, "You are speaking to the cops. You are a fucking snitch. I pissed down your cell, too."

114.     Defendant Bauer wrapped up inside plaintiff's state-issued sheet $30.00 worth of plaintiff's cosmetics bought from commissary: (1) Sulfer 8 anti-dandruff conditioner=$8.00; (2) Freshscent lotion x4=$1.52; (3) NEXT Cocoa Butter Bar x4=$3.00; (4) Lusti Pomade Hair Grease X3=$4.95; (5) Sensodyne Toothpaste x6=$9.00; (6) Freshscent Deodorant X3=$1.56; and (7) Dial Soap=$1.49.

115.     Defendant Bauer then put that sheet full of cosmetics into the garbage can placed outside of plaintiff's cell door, along with all of plaintiff's blank grievance forms and some grievances which plaintiff had previously filed against the RHU guards, and left.

116.     Defendant Bauer provided no DC-154A, Confiscated Items Receipt ("CIR"), for the property he trashed and destroyed; thus, no meaningful post-deprivation remedy was available to plaintiff.

117.     Defendants Spencer and John Doe #4 then put plaintiff into his cell—which defendant Bauer had drenched with urine—and denied plaintiff cleaning supplies until May 14, 2023.

118.     Because defendant Bauer urinated on plaintiff's slightly torn mattress, a sickening, nauseating mold grew on it, and in it, causing an unbearable, noxious stench and making plaintiff sick to his stomach; making plaintiff sleep on the ground where flies, ants, and spiders walked over him and crawled inside his nostrils, ears, and mouth; making plaintiff lose sleep for days at a time resulting in paranoia, anxiety, and mental distress; making plaintiff constantly vomit; and making plaintiff lose substantial weight resulting in weakness and fainting.

119.    From May 11, 2023 to May 14, 2023, plaintiff took his food trays but could not eat the food, because of the stench, mold, and inhuman cell conditions, nor could he exercise.

120.    As a result of the retaliation by defendants Bauer, Spencer, and John Doe #4, plaintiff suffered disabling migraine headaches; a bleeding rash on his arms and legs; teeth grinding from stress; chest pain; inability to breathe; burning in his eyes, nose, and throat; agonizing pains and sores on his shoulders, legs, and back; bleeding, itchy, painful bug and spider bites; and stomach distress.

121.    Defendant Bauer also urinated on plaintiff's law book—the PLRA Handbook by John Boston (ISBN 979-8-9854138-0-9)—priced at $224.99, and thus destroyed it.

122.    Plaintiff filed a grievance and grievance appeals with defendants Varner, Moore, Lowe, and Irwin regarding this reprisal by defendants Bauer, Spencer, and John Doe #4; however, defendants Varner, Moore, Lowe, and Irwin denied the grievance and grievance appeals and did not discipline the officers, encouraging and condoning the ongoing retaliation issues.

*Due Process, Retaliation*

123.    On May 12, 2023, another disciplinary hearing was convened by defendant Collins, regarding the retaliatory misconduct report fabricated by defendants Mowery and Mohoney on April 25, 2023.

124.    At this disciplinary hearing plaintiff complained of the whereabouts of his inmate version form and told defendant Collins to include in the Part 2(B) his allegations of constitutional violations by the officers. (DC-ADM 801, Section 4.A.4., provides that "if the inmate is found guilty, a written summary shall be prepared by using the DC-141,

Part 2(B), Disciplinary Hearing Report that includes the facts relied upon by the Hearing Examiner to reach the decision, and the reasons for the decision. The DC-141, Part 2(B) shall also include findings of fact concerning the testimony of each witness presented. A copy of the DC-141, Part 2(B) shall be given to the inmate....").

125.    Defendant Collins informed plaintiff: "This is not a court of law. The video shows a motion knocking several officers backwards. Then you were taken to the ground. You are guilty of all charges and sentenced to 150 days Disciplinary Custody ("DC")."

126.    After this disciplinary hearing plaintiff received the Part 2(B) signed by defendant Collins stating "video shows....[that] while standing in front of his cell door there is a sudden motion knocking several officers backward and I/M [plaintiff] is taken to the ground. Once control is gained he is taken off the block. Non-conclusive as view of I/M is obscured by officers. HEX [defendant Collins] believes officer Mowery's report over I/M's denial that he did assault officer Mowery by shoulder checking him when he pushed back in an effort not to be placed back in his cell. I/M did threaten an employee or their family with bodily harm and used abusive, foul, obscene, or inappropriate language to or about an employee. I\M refused all orders to enter his cell," and sentencing plaintiff to serve 150 days in punitive segregation.

127.    This Part 2(B) written by defendant Collins was fabricated: It distorts plaintiff's testimony made at the disciplinary hearing because it states that plaintiff testified to having "filed a PREA because the officers ripped around his handcuffs"; it omits entirely plaintiff 's testimony regarding the actual PREA allegation; and it adds an allegation that plaintiff had refused an order to enter his cell, despite that the officers never once alleged that plaintiff had refused to enter his cell.

128.     Based on plaintiff's evidence presented against the officers at the disciplinary hearing—a ripped t-shirt, the credible testimony of plaintiff, the video of the incident, and a clearly discrediting misconduct report in light of the video footage that defendant Collins reviewed—defendant Collins knew of the officers' violent, sexual retaliation against plaintiff, and knew of plaintiff's innocence and of the officers' guilt regarding the fabricated, retaliatory misconduct report.

129.     Defendant Collins disregarded plaintiff's evidence against the officers and meted out the 150-day DC sentence in retaliation for plaintiff's reporting the officers' retaliation and abuse: defendant Collins ordered that defendants Minich and Yount destroy the plaintiff's inmate version form, so that defendant Collins could fabricate the Part 2(B) in order to conceal not only the retaliatory DC sentence, but also the officers' retaliation and sexual abuse.

130.     Plaintiff then filed with defendants Varner, Moore, Irwin, Walker, Alexander, Gustafson, Blicha, and Moslak two grievances, multiple grievance appeals, and misconduct appeals concerning the retaliation and abuse by defendants Mowery, Yount, Mohoney, Bulers, Bauer, John Doe #1, John Doe #2, Walker, and Spencer; the retaliatory destruction of the inmate version form by defendants Collins, Yount, and Munich; and the denial of a fair and impartial disciplinary hearing resulting in the retaliatory fabrication of the Part 2(B) and the retaliatory imposition of the 150-day DC sentence by defendant Collins.

131.     Defendants Varner, Moore, Irwin, Walker, Alexander, Gustafson, Blicha, and Moslak denied both grievances and all the grievance appeals and misconduct appeals, or upheld the retaliatory DC sentence and fabrication of the Part 2(B), or refused to

discipline defendants Mowery, Mohoney, Yount, Bauer, Bulers, John Doe #1, John Doe #2, Walker, and Collins or otherwise prevent further retaliation against plaintiff; instead, these supervisory defendants agreed with each other in the misconduct appeal responses that "the procedures employed were in complete accordance with policy"—an unconstitutional policy of defendant Harry that resulted in the aforementioned constitutional violations.

132.    As a result of the retaliatory abuse by defendants Mowery, Yount, Bulers, John Doe #1, John Doe #2, Bauer, Walker, Mohoney, and Spencer; the retaliation by defendant Laver; the following denial of medical care by defendants Strick, John Doe #3, Watson, and Crystal; and the following denial by defendants Varner, Moore, and Irwin of plaintiff's grievances or appeals concerning the denial of medical care by defendants Strick, John Doe #3, Watson, and Crystal, plaintiff suffered brain damage; a broken right elbow; an extremely sore left wrist, neck, face, ribs, and ankles; disabling migraine headaches causing inability to eat, sleep, or move; numbness in his fingers; severe body pain; cognitive dysfunction; diminished mobility to his right elbow, left wrist, fingers, and neck; whiplash to his neck and head; cuts and abrasions to his wrists and ankles; a swollen face and head; rectal bleeding, rippage, and pain; increased PTSD, night terrors, anxiety, and flashbacks; nausea; inability to exercise resulting in muscle atrophy; panic attacks; and permanent distrust and fear of law enforcement personnel.

133.    As a result of the fabricated retaliatory misconduct report by defendants Mowery and Mohoney; the following retaliatory discarding of the inmate version form by defendants Yount, Minich, and Collins; the following retaliatory DC sentence, fabrication of the Part 2(B), and denial of due process by defendant Collins; the following retaliatory

upholding of the retaliatory DC sentence by defendants Alexander, Gustafson, Blicha, Irwin, Moslak, and Harry; and the failure to prevent retaliation, abuse, and due process violations by defendants Moslak, Harry, Walker, and Irwin, plaintiff served 150 days in the inhuman conditions of punitive segregation, where the untrained, undisciplined officers subjected him to atypical and significant hardships, as follows: (1) Defendant Mowery urinated and spit in plaintiff's food because of his complaints against him; (2) The officers repeatedly denied and interfered with plaintiff's familial visits and obstructed U.S. mail addressed to the ACLU, attorneys, and family; (3) The officers continued to fabricate misconduct reports in retaliation, and defendants Muntz, Moslak, Irwin, Blicha, Alexander, and Gustafson kept plaintiff in the RHU for complaining about staff misconduct; (4) The officers denied plaintiff in-cell property and repeatedly destroyed the property he eventually acquired, causing psychological torture and suicide attempts resulting in physical injuries; (5) The officers conducted abusive strip searches as harassment and then issued another fabricated misconduct report when he refused to perform sexually abusive acts on himself; (6) The officers repeatedly used unnecessary force against plaintiff; (7) The officers denied plaintiff showers; (8) Defendant Bauer urinated in plaintiff's cell causing inhumane cell conditions; (9) The constant illumination in the cell caused insomnia, migraine headaches, and sleep deprivation; (10) The handcuffs repeatedly cut and infected his wrists; (11) The plaintiff was separated from other inmates who were going to draft affidavits for this litigation; (12) The medical staff maliciously and sadistically denied plaintiff medical care for Hyperthyroidism and for the serious injuries described in the present complaint; and (13) The plaintiff was arbitrarily denied law library; and so on.

134.    Hence, plaintiff suffered a degraded reputation; loss of privileges, including tablet, TV, visits, educational classes, commissary, adequate recreation; loss of status, custody level, and any chance at commutation; sleep deprivation; loss of liberty and movement; diminished quality of life amounting to physical and psychological torture; physical and mental deterioration; sensory deprivation; and exacerbated symptoms of PTSD, anxiety, night terrors, depression, paranoia, and Hyperthyroidism.

*Deliberate Indifference*

135.    On May 15, 2023, plaintiff filed grievance 1035536, pointing out the denial of medical care by defendants Strick, Crystal, and Watson and the incorrect X-rays ordered by defendant Strick. In this grievance plaintiff requested testing for internal bleeding, testing for heart problems associated with Hyperthyroidism, an EKG, physical and psychotherapy, migraine and pain medication, and correct X-rays.

136.    Defendants Moore, Varner, K. Smith, and Irwin denied the grievance and all requested relief on the false grounds that plaintiff "provided false information asserting [his] alleged injuries went untreated," and that defendant Strick had reported in medical records that plaintiff had "fall[en] in [his] cell which caused the alleged injuries"—a sham to conceal the plaintiff's injuries sustained from the officers' abusive retaliation.

*Retaliation, Misuse of Force, Conditions of Confinement*

137.    On June 6, 2023, plaintiff was rescheduled to attend PREA counseling with PREA Counselor Trina because he had sought PREA counseling for his trauma sustained as a result of the RHU officers' prior sexual abuse of him.

138. That day, a C.O. told plaintiff over his in-cell intercom, "If this is another teleconference where you cry to a PREA counselor, then we are going to fuck you up and punish you again."

139. Over the telecom plaintiff replied, "I am going to the PREA counseling."

140. Moments later, defendant Fredrick came to plaintiff's cell door and said: "Pack up. You are moving to the grind-up cell until you stop contacting these organizations," and left. (In prison punishment cells are known as "grind-up cells," where RHU officers house inmates who complain about prison officials. These cells are located in the corner of the RHU, with no sight of the TV there, and are never cleaned and the water is often turned off. There, the RHU officers deprive the prisoner of property as a form of retaliatory, psychological torture.).

141. Later that day, defendants Spencer and John Doe #5 (plaintiff believes that defendant John Doe #5 is defendant Lesko, but he is not certain) came to plaintiff's cell door, handcuffed plaintiff behind his back, attached a tether to his handcuffs, and moved plaintiff from J Unit D Pod to J Unit B Pod.

142. When defendants Spencer and John Doe #5 and plaintiff entered J Unit B Pod, a host of inmates shouted to defendants Spencer and John Doe #5, "The toilet in that cell is broken and overflowed. You are going to put him [plaintiff] in there with a broken toilet? That is not cool."

143. Then defendant John Doe #5 entered J Unit B Pod 5 Cell—the grind-up cell in which they planned to house plaintiff—and flushed the toilet, spilling thick, brown sewage water on the floor of the cell.

144.     From inside the cell defendant John Doe #5 laughed and told defendant Spencer, who was standing outside the cell with plaintiff, "The PREA counselor will not get close to him now."

145.     Defendant Spencer put plaintiff in this squalid cell, closed the cell door behind plaintiff.

146.      Then from outside the cell defendant Spencer maliciously and sadistically pulled with full force through the cell wicket the tether attached to plaintiff's handcuffs until his wrists broke and bled.

147.     Defendant Spencer forcefully pulled plaintiff's handcuffs through the cell wicket for approximately two minutes as plaintiff cried out in agonizing pain, and then defendant Spencer removed the handcuffs from plaintiff's bloody, broken wrists.

148.     During this assault defendant John Doe #5 remained outside plaintiff's cell and did not intervene.

149.     Outside the cell, defendant Spencer withheld plaintiff's legal work and property and said, "We are going to trash your legal work because you contacted organizations again."

150.     Shorty after these events, defendant Fredrick came to plaintiff's cell door and asked plaintiff if he was "ready for a beating."

151.     Plaintiff informed defendant Fredrick—and defendant Burkhart, who at some point came to plaintiff's cell door—that he wanted to attend PREA counseling but did not want to be beaten, and that he could not be handcuffed because his wrists, he said, were "bleeding and broken."

152.    Defendant Burkhart informed plaintiff, "If you go to PREA counseling we will beat you."

153.    Defendants Spencer, Fredrick, and Burkhart (plaintiff believes defendant John Doe #5 was there too) lurked outside plaintiff's cell like a menacing gang and said to each other, "Be ready to beat Kauffman's ass like Mowery did. He just never learns his lesson."

*Deliberate Indifference, Retaliation*

154.    Plaintiff requested medical care for the injuries to his wrists, and then defendants Fredrick, Spencer, Burkhart, and John Doe #5 left.

155.    Moments later, defendant McGill came to plaintiff's cell door and took pictures of his injured wrists.

156.    Plaintiff reported the officers' abuse to defendant McGill.

157.    Defendant McGill provided a bandage but denied plaintiff pain medication, a referral to a qualified doctor for X-rays, extra bandages, and anti-biotic cream in retaliation for reporting the officers' abuse.

*Retaliation, Conditions of Confinement*

158.    Immediately plaintiff bandaged his wrists, pressed the in-cell intercom button, and informed the officers in the bubble that he wanted to attend PREA counseling.

159.    Over the intercom, the officers taunted plaintiff, "Fuck your teleconference, dickhead," and denied plaintiff's scheduled PREA counseling.

160.    Then plaintiff was served a lunch tray in the filthy cell conditions and could not eat because of the feces stench, and remained in that cell for hours.

161. This punishment cell was covered in human feces, urine, blood, bugs, and pepper spray; neither the sink nor the toilet worked.

162. Hours later, plaintiff was moved to J Unit B Pod 2 Cell, which was also filthy and fly infested.

163. From outside that cell, defendants Burkhart, Carbon, and John Doe #6 went through the plaintiff's property and came to an agreement to destroy maliciously and sadistically six legal notebooks labeled on the cover "Legal Work (1983)."

164. Plaintiff said: "You cannot destroy those notebooks. That is my legal work."

165. Nevertheless, defendant Burkhart ordered plaintiff to sign a CIR for destruction of the six legal notebooks.

166. Plaintiff refused to sign the CIR and asked to speak to defendant Walker.

167. To conspire with defendant Walker, defendant Burkhart left the RHU pod carrying the plaintiff's legal notebooks and the CIR.

168. Moments later, defendant Burkhart returned to plaintiff's cell door and said that defendant Walker signed the CIR on plaintiff's behalf and that they were going to destroy the legal notebooks.

169. This destruction of legal notebooks hampered plaintiff's civil actions—both the present civil action and Case No. 3:23-cv-239-KAP—because the legal notebooks contained seven months of hard work of drafting both the present complaint and the complaint relating to Case No. 3:23-cv-239-KAP; and included legal notes, irreplaceable dates and times of ongoing and prior constitutional violations at SCI-Forest, and case law citations needed to defend plaintiff's civil claims. (A total of 1,200 pages of legal work were destroyed.).

170.    A policy of defendants Irwin, Walker, and Harry condoned and encouraged the officers to destroy plaintiff's legal notebooks if he had more than six notebooks in his property.

171.    Defendants Moore, Varner, and Blicha denied plaintiff's grievance in which he asked that the notebooks be returned and the retaliation be stopped; thus, they allowed the ongoing retaliation to flourish—unpunished—and refused to order defendants Walker, Burkhart, Carbon, and John Doe #5 to return plaintiff's legal notebooks.

172.    As a result of the squalid cell conditions, the malicious and sadistic pulling of plaintiff's handcuffs by defendant Spencer and the following denial of medical care by defendants Sharp and McGill, plaintiff suffered two broken wrists; permanent scarring on his wrists; diminished mobility; numbness in his hands and fingers; an infection in his right wrist; inability to shower, brush teeth, wash clothes, clean, and exercise; muscle atrophy; burning to his eyes and throat; vomiting; inability to breathe; migraine headaches; loss of appetite; peeling skin on his wrists; nausea; bleeding and swelling to his wrists; and increased PTSD, night terrors, depression, anxiety, and mental deterioration.

*Deliberate Indifference*

173.    On June 11, 2023, defendant Sharp said plaintiff's symptoms were from problems with his thyroid and prescribed Tapazole for it; however, no one provided information on thyroid issues nor explained the negative side effects of taking Tapazole: agonizing, exacerbated heart palpitations; body aches and cramps; headaches; hair loss; itching; arthralgia; drowsiness; loss of taste; vomiting; dark urine; dizziness; loss of appetite; fever; change in skin color; stomach pain; indigestion; swelling; difficulty in breathing;

heartburn; hives; muscle weakness; melena; chest pain; chills; fever, chills or sore throat; rash, itching, skin discoloration.

174.    Defendant Sharp also denied plaintiff bandages, X-rays, and anti-biotic ointment for the above-described injuries.

*Supervisory Liability*

175.    On June 14, 2023, plaintiff sent a letter to defendant Harry complaining of, among other things, misconduct reports fabricated in retaliation by officers Wells and Fritz and defendants Mowery and Mohoney and fabricated to conceal ongoing, retaliatory abuse by officer Wells and defendants Mowery, Yount, Walker, Mohoney, Bulers, and others; fabrication of documents to conceal ongoing, retaliatory DC confinement by defendants Collins, Irwin, Blicha, Alexander, Eisenman, and Gustafson; denial of medical care for his broken bones and head injury; an ongoing, systematic practice of obstructing legal mail to interfere with his civil actions; ongoing, retaliatory property interference by defendant Walker; and ineffective, unavailable administrative remedies, including the grievance and misconduct system.

*Deliberate Indifference*

176.    On June 21, 2023, defendant Jordan came to plaintiff's cell door, said that she was "done with [plaintiff's] bullshit medical games," and that his disability accommodation form was denied. That same day, in response to plaintiff's medical concerns, defendant Jordan falsely said in medical records that plaintiff was being "argumentative" about his medical issues.

177.    Between 6:00 a.m. to 6:20 a.m. on September 22, 2023, defendant Richards took from plaintiff's cell door a sick call request—wherein plaintiff complained about

agonizing hunger pains; inability to sleep, exercise, and breathe; lightheadedness; loss of 49 pounds; and exacerbated heart palpitations—and put it into the sick call box on J Unit D Pod. In his sick call request plaintiff asked for a medical diet for his thyroid problems.

178.    A couple weeks later, plaintiff asked an RN why nobody had seen him about the sick call request, and the RN said, "I will look into it."

179.    The next day, this RN informed plaintiff, "The record shows that you did not submit a sick call request. You have to submit another one."

180.    On October 6, 2023, plaintiff submitted another sick call request concerning the same concerns described above.

181.    On October 10, 2023, defendant Strick saw plaintiff cell side and reported in medical records that she thought his thyroid was getting worse and noted a loss of weight of from his picture, his last weight being recorded at 155 pounds, and his weight on August 13, 2020, being recorded at 222 pounds.

182.    During this examination plaintiff said: "I need surgery and a medical diet. The heart palpitations, hunger pains, lightheadedness, loss of hair, and inability to sleep, to breathe, and to exercise are getting worse. I need information on thyroid problems and Tapazole. Why did you trash my last sick call request?"

183.    Defendant Strick said: "I am tired of your complaining. I am a doctor, not a teacher. All I do is prescribe medication. Unless your upcoming blood test and weight check shows loss of weight because of your thyroid, you are not getting a medical diet."

184.    Instead of providing plaintiff information on thyroid problems and Tapazole, defendant Strick discontinued the Tapazole, with no explanation to plaintiff, depriving him of the medication from October 10, 2023 to October 11, 2023.

185.     On October 11, 2023, plaintiff weighed in at 151 pounds—a 49 pound weight loss compared to his average weight of 200 pounds, and a 71 pound weight loss compared to his recorded weight of 222 pounds on August 13, 2020.

186.     On October 12, 2023, plaintiff's blood was tested and came back demonstrating lower than normal levels concerning his thyroid.

187.     That day, defendant Strick re-prescribed plaintiff's Tapazole, with no explanation to plaintiff.

188.     On October 15, 2023, defendant Jordan signed off on plaintiff's labs stating that his medication (Tapazole) was "ok" and to repeat labs in two months; however, defendant Jordan denied plaintiff a medical enhancement diet, despite having seen in medical records the plaintiff's loss of substantial weight. Defendant Jordan provided plaintiff no information on his thyroid or Tapazole.

189.     On October 16, 2023, plaintiff sent a request slip to defendant Strick requesting a medical diet, but to no avail.

*Retaliation, Deliberate Indifference*

190.     Because defendant Strick was not communicating with plaintiff about his condition and her treatment decisions, plaintiff thought defendant Strick retaliated by stopping the Tapazole on October 10, 2023; thus, on October 23, 2023, plaintiff filed grievance 1058155 alleging deliberate indifference and retaliation, and requesting a medical diet and surgery, and pointing out that defendant Strick had trashed his sick call request on September 22, 2023.

191.    On October 23, 2023, the same day plaintiff filed grievance 1058155 against defendant Strick for refusing him a medical enhancement diet, defendant Strick prescribed a medical diet to an inmate housed in a cell right across from plaintiff's cell.

192.    When plaintiff called defendant Strick over to his cell door, defendant Strick told plaintiff, "I already told you that I am tired of your complaining," and left.

193.    The following days defendant Strick ignored plaintiff when he asked to speak to her at his cell door.

194.    On October 26, 2023, plaintiff informed defendant Gustafson of defendant Strick's retaliation and deliberate indifference, and requested surgery and a medical diet.

195.    Defendant Gustafson said that he would "talk to CHCA Jordan [defendant Jordan]."

196.    That day, plaintiff sent a request slip to defendant Strick complaining about his thyroid and requesting a medical diet, but he was told that the issues were already addressed in grievance 1058155.

197.    On October 30, 2023, plaintiff submitted a sick call request complaining about a loss of 49 pounds, erectile dysfunction, hunger pains keeping him awake all night, and heart palpitations. Plaintiff pointed out that he needed a medical diet and surgery, and that his thyroid problem was getting worse.

198.    Defendant Strick returned the sick call request to plaintiff via institutional mail, with no explanation and no follow up.

199.    On October 30, 2023, plaintiff also sent defendant Gustafson a follow-up request slip concerning defendant Strick's negligence and her refusal to prescribe a medical diet or even to speak with him at all.

200. Defendant Gustafson replied saying that he had already spoken to defendant Jordan and that "a follow up was already scheduled concerning your thyroid."

201. On November 13, 2023, plaintiff submitted another sick call request concerning his thyroid and his need for a medical diet and surgery.

202. On November 15, 2023, plaintiff sent a request slip to defendant Jordan, ranting about defendant Strick's retaliation and deliberate indifference, and requesting a medical diet and surgery, and pointing out that his symptoms were getting worse.

203. On November 16, 2023, defendant Strick came to plaintiff's cell door and said to plaintiff, "Alright. You complained to all my supervisors. Whatever. You win. You have Hyperthyroidism. [this was the first time defendant Strick informed plaintiff about his lab results]. So I guess I will raise your Tapazole and you will be getting a medical diet."

204. Plaintiff replied, "Getting medical care is not something I consider a game. I still have gotten no information on thyroid problems or Tapazole, and my condition is getting worse, especially the heart palpitations."

205. Defendant Strick left providing no information on either, and maliciously and sadistically increased plaintiff's Tapazole, knowing that that medication was painful and ineffective.

206. On November 19, 2023, plaintiff was provided a medical diet for his thyroid ailment—an "enhancement medical bag" ("E-bag").

207. Plaintiff suffered unnecessary pain, the above-described side effects of Tapazole, loss of sleep and weight, weakness, fatigue, and hunger pains from this delayed prescription of a medical diet, this painful course of treatment, and from this refusal of information on thyroid problems and Tapazole.

*Retaliation*

208.    Defendant C.O. Moore is the officer to whom plaintiff turned over a civil complaint—wherein plaintiff sued 77 Pennsylvania Department of Corrections employees (Case No. 3:23-cv-239)—for mailing to the United States District Court for the Western District of Pennsylvania on September 28, 2023.

209.    When plaintiff turned over this civil complaint to defendant C.O. Moore on September 28, 2023, defendant C.O. Moore took the civil complaint from plaintiff's cell wicket, read the attached cash slip for payment of U.S. Postage (the attached cash slip stated that the legal mail contained a "1983 complaint filed against 77 defendants"), and stated: "You are dead to us if you file this lawsuit"—evidencing defendant C.O. Moore's retaliatory animus in connection with the following denial of zoom visits and reprisals.

210.    On November 22, 2023, plaintiff filed grievance 1062122 against defendants Walker and Lowe and the RHU staff, complaining about denial of law library in the RHU.

211.    At 10:30 a.m. on November 23, 2023, plaintiff had a familial video visit (zoom visit) scheduled to occur in the RHU. (DC-ADM 801, Section 6.A.5., limits visits to one video visit per month for inmates housed in the RHU.).

212.    That morning, defendant C.O. Moore gave plaintiff a lunch tray and said, "Oh, you like filing grievances?"

213.    At that time plaintiff did not know that his family had scheduled a zoom visit for November 23, 2023; thus, plaintiff at that point did not know why defendant C.O. Moore said that.

214. Unknown to plaintiff at that time, defendant C.O. Moore denied plaintiff's zoom visit on November 23, 2023, in retaliation for filing grievance 1062122 against defendants Walker and Lowe and the RHU staff regarding the denial of law library in the RHU and for filing Case No. 3:23-cv-239-KAP.

215. To conceal the this retaliatory denial of plaintiff's zoom visit, defendant C.O. Moore conspired with the other RHU officers—whom plaintiff believes to be defendants Walker, Lowe, Mowery, Mohoney, Richards, Fredrick, and/or Lesko—to fabricate records saying that "technical difficulties" prevented the zoom visit on November 23, 2023.

216. Plaintiff's family, however, waited on the zoom visit for 45 minutes for plaintiff to show up, and the zoom visit did not cut off until the end of the entire 45-minute zoom call.

217. On November 23, 2023, defendants C.O. Moore, Mohoney, Mowery, Richards, Walker, Lowe, Fredrick, or Lesko did not attempt to take plaintiff to the zoom visit and did not inform plaintiff of the zoom visit.

218. Hence, technical difficulties did not prevent the zoom visit on November 23, 2023; the officers' retaliation did.

219. On November 29, 2023, defendant Yount handed out diner trays on the RHU pod and gave plaintiff a tray and his prescribed E-bag—from which defendants Yount, Lesko, and Lowe had stolen the peanut butter in retaliation for plaintiff's filing grievance 1062122 against defendants Walker and Lowe and the RHU staff on November 22, 2023.

220. Immediately plaintiff showed defendant Yount that the E-bag was missing peanut butter and requested that defendant Yount provide the peanut butter.

221.     Defendant Yount said: "No. You file grievances."

222.     Plaintiff then held open his cell wicket and requested to speak with defendant Lowe about the missing peanut butter.

223.     Moments later, defendant Lowe came to plaintiff's cell door, and plaintiff explained that defendant Yount retaliated by stealing the peanut butter.

224.     Defendant Lowe replied: "You are right, bitch. We [defendants Lowe, Yount, and Lesko] stole the food from your diner bag to starve you, because all you do is complain! You thought we forgot about the grievance you filed on us the other day?" and left.

225.     Later that night, defendant Lowe returned to plaintiff's cell door and taunted: "You are probably hungry in there."

226.     Plaintiff informed defendant Lowe that he has a right to file grievances and requested the missing peanut butter.

227.     Then defendant Lowe picked up the remote controls for the RHU TVs on the RHU pod.

228.     Defendant Lowe then threw the TV remote controls into the garbage can on the RHU pod as he belligerently screamed: "Fucking pedophiles!"

229.     Defendant Lowe tied up the trash bag, left the RHU pod carrying that trash bag, and denied all the RHU inmates their allotted TV time in retaliation for plaintiff's grievance against him.

230.     Although the RHU handbook mandates that the RHU TVs be turned on every day from 6:00 p.m. to 11:00 p.m., defendants Yount and Lowe denied plaintiff and all the other RHU inmates their allotted TV time that day in retaliation.

231.    Plaintiff suffered psychological distress, infringements to his First Amendment right, and agonizing hunger pains resulting in loss of sleep and stress as a result of this reprisal.

232.    Defendants Varner, Moore, and Gustafson denied plaintiff's grievance and grievance appeals concerning this reprisal by defendants Lowe, Yount, and Lesko—allowing the ongoing retaliation to flourish, undeterred.

233.    Then plaintiff's family rescheduled the zoom visit for November 30, 2023, at 2:30 a.m.—which was again unknown to plaintiff at that time.

234.    On November 30, 2023, defendants Walker, Lowe, Mohoney, Mowery, C.O. Moore, Richards, Fredrick, and/or Lesko did not turn on plaintiff's rescheduled zoom visit for plaintiff's family, did not attempt to take plaintiff to the zoom visit, and did not inform plaintiff of the zoom visit—thus blocking both plaintiff and his family from the zoom visit.

235.    Defendants Walker, Lowe, Mohoney, Mowery, C.O. Moore, Richards, Fredrick, and/or Lesko attempted to conceal this retaliatory denial of the visit by fabricating the records to say that an "emergency situation" prevented the zoom visit on November 30, 2023.

236.    On information and belief, there was no emergency situation in the RHU on November 30, 2023.

237.    The denial of the zoom visit on November 30, 2023, was done in retaliation for plaintiff's filing a grievance and civil complaint (Case. No. 3:23-cv-239).

238.    On December 5, 2023, at the next zoom visit, plaintiff's family asked plaintiff why he had "refused" the zoom visits on November 23 and 30, 2023.

239.     Plaintiff then had to explain to his family that the RHU officers did not inform him of such visits and that they instead denied him both visits.

240.     After this zoom visit on December 5, 2023, defendants Mowery and Mohoney took plaintiff back to his RHU cell and put him inside his cell.

241.     Once plaintiff was inside his cell, defendant Mowery said: "We denied your visits because you filed a grievance against Lowe and Walker about law library! Put that in your lawsuit, pussy!"

242.     Defendants Varner, Moore, Bell, and Irwin denied plaintiff's grievance and. grievance appeals concerning the aforementioned retaliatory denials of the zoom visits by defendants Walker, Lowe, Mohoney, Mowery, Richards, C.O. Moore, Frederick, and/or Lesko on the false grounds that the zoom visit on November 23, 2023, "was affected by technical difficulties and the family contacted institution notifying of the issue which allowed the visit to be rescheduled on November 30, 2023. There was an emergency situation in the unit during the time of the scheduled visit and he was not able to make the visit due to institutional needs," despite plaintiff's assertions that the officers fabricated the records in an effort to conceal their retaliation.

243.     In denying plaintiff's grievance, defendants Varner, Moore, Bell, and Irwin condoned the ongoing retaliation problem and allowed it to flourish because that is what they wanted.

244.     On December 7, 2023, plaintiff informed defendant Irwin cell side of the retaliatory denials of the zoom visits by the officers.

245.     Defendant Irwin replied: "I can do something about it if you dismiss me from your lawsuit."

246.     On December 14, 2023, plaintiff confronted defendant Walker cell side about the retaliatory denials of the zoom visits.

247.     Defendant Walker replied: "You should have thought about this before you had filed a grievance and lawsuit on me."

*Deliberate Indifference, Retaliation*

248.     On December 15, 2023, defendant Snyder came to plaintiff's cell door and said, "Your lab results came back. I am going to prescribe you Tapazole because your thyroid levels are low."

249.     Plaintiff informed defendant Snyder: "I have been taking Tapazole for months, and my heart problems, inability to breathe and exercise, and hunger pains are only getting worse. Clearly you did not review the medical records. I need surgery or more effective treatment. These symptoms have been going on for almost a year, and nobody tells me anything about this ailment or Tapazole."

250.     Plaintiff handed defendant Snyder the grievance response written by defendant Jordan and informed defendant Snyder that he has been filing grievances and sick call requests for almost a year requesting treatment for his thyroid.

251.     Defendant Snyder read the grievance response and then stepped away from the plaintiff's cell door, rolling her eyes and appearing irritated that plaintiff had filed a grievance.

252.     Defendant Snyder then gave plaintiff the grievance response and after that refused to listen to plaintiff's concerns.

253.     Plaintiff then filed a grievance appeal with defendant Irwin, pointing out that defendant Snyder did not review medical records before seeing him on December 15,

2023, and that defendants Snyder, Strick, and Jordan were intentionally denying him medical care for his thyroid.

254. Defendant Irwin denied the grievance and all requested relief.

255. Plaintiff filed a final level grievance appeal with defendants Moore and Varner, pointing out the ongoing denial of medical care by defendants Jordan, Irwin, Snyder, and Strick.

256. Defendants Varner and Moore denied the grievance appeal and all requested relief.

*Supervisory Liability*

257. On January 18, 2024, at a Program Review Committee ("PRC") meeting, plaintiff complained to defendant Alexander about the retaliatory denials of zoom visits by defendants Walker, Lowe, Mohoney, Mowery, C.O. Moore, Richards, Fredrick, and Lesko.

258. Defendant Alexander replied: "We will figure out the visit problems for you as soon as you sign off on your grievances and lawsuit."

*Deliberate Indifference*

259. On January 8, 2024, plaintiff submitted a sick call request complaining about symptoms associated with COVID-19—a nose bleed, constant headaches, nasal discharge, a cough, a sore throat, body aches, inability to sleep, and high body temperature—and symptoms associated with thyroid problems, including inability to breathe, heart palpitations, a racing heart, etc. Plaintiff also requested surgery and information on Hyperthyroidism.

260. Later that day, RN Myers-Huff saw plaintiff cell side and said that defendant Strick would have him tested for COVID-19.

261. On January 9, 2024, defendant Strick saw plaintiff and said that he was merely "dehydrated" and need only "drink more water."

262. Plaintiff informed defendant Strick that had COVID-19 and should be tested and hospitalized. Plaintiff also complained about his thyroid problems and symptoms and asked for information on thyroid problems and Tapazole and requested effective treatment.

263. Defendant Strick sarcastically stated: "Well yeah. There's a deadly virus going around and killing people," yet refused to have plaintiff tested for COVID-19 and prescribed only flu pills instead of needed medication and hospitalization.

264. Defendant Strick purposefully refused to provide information on thyroid problems and Tapazole and continued maliciously and sadistically treating plaintiff's ailment with Tapazole, knowing that it was causing plaintiff pain and discomfort.

265. On February 19, 2024, plaintiff's blood was tested for his thyroid, and the lab results showed something wrong with plaintiff, because his symptoms remained.

266. However, defendant Snyder—without speaking to plaintiff—discontinued the Tapazole on February 20, 2024, and fabricated medical records saying that the labs showed nothing wrong with plaintiff.

*Deliberate Indifference, Retaliation*

267. On February 23, 2024, defendant Snyder briefly stopped at the side of plaintiff's cell door for about five seconds and then left, saying nothing to plaintiff.

268.    Plaintiff believes that defendant Snyder fabricated medical records saying that she spoke to him on February 23, 2024, concerning his thyroid.

269.    On February 27, 2024, plaintiff filed grievance 1076140, pointing out that defendant Snyder was facilitating a conspiracy among defendants Irwin, Jordan, and Strick to embezzle federal and state funds that should have been used to treat plaintiff's thyroid, by denying plaintiff medical care and refusing to follow up so that the funds could go into the pockets of the defendants. Plaintiff also pointed out that defendant Snyder fabricated medical records saying that there was nothing wrong with plaintiff, and that she discontinued his Tapazole without an explanation.

270.    On February 28, 2024, plaintiff spoke to defendant Snyder, complaining about the denial of treatment for his thyroid and asked for some type of explanation.

271.    Defendant Snyder refused to provide any explanation or information on his ailment but said, "I will look into it."

272.    Before leaving the RHU pod, however, defendant Snyder said a retaliatory, smart-alek remark: defendant Snyder said, "Yup. And I will make sure it is 'on the books,'" referring to the aforementioned grievance concerning her facilitation of embezzlement.

273.    To conceal the embezzlement, the prison administration refused to provide the response to that grievance until the time limit to file a final level appeal ran.

*Retaliation, Free Speech, Unlawful Search and Seizure, Due Process*

274.    On February 28, 2024, defendants DeAngelo and Marshal came to plaintiff's cell door, to escort plaintiff and a box full of United States Marshals 285 Forms, Waiver of Service Forms, and sixty copies of the civil complaint for Case No. 3:23-cv-239 (wherein plaintiff sued defendants Walker and Mohoney, among others) to R&D, so that R&D and

the SCI-Forest mailroom could mail said legal mail to the United States District Court Clerk's Office in Johnstown, PA, for service of the complaint on defendants Walker and Mohoney, *et. al.*

275.    Defendants DeAngelo and Marshal restrained plaintiff, pulled him from his RHU cell, and put the box of outgoing legal mail on a property cart.

276.    Then defendant DeAngelo searched and read the legal mail.

277.    Defendant DeAngelo said: "Oh. A box of civil complaints and Marshal Forms. We got something for you when you get back from R&D, snitch."

278.    Then defendants DeAngelo and Marshal took plaintiff and the box of legal mail to R&D, where they met defendant Reddinger.

279.    At R&D plaintiff informed defendant Reddinger that defendant DeAngelo had already searched and read the legal mail in the RHU.

280.    Defendant Reddinger searched and read the legal mail again, however, and said: "A lawsuit? Let the games begin. You will regret this."

281.    As harassment defendant Reddinger twice forced plaintiff to rewrite the cash slip attached to the legal mail for payment of U.S. Postage, each time sarcastically telling plaintiff that he had done it incorrectly.

282.    Moments later, defendant Bell showed up at R&D.

283.    Plaintiff informed defendant Bell that both defendants DeAngelo and Reddinger had already twice searched and read the legal mail.

284.    Defendant Bell searched and read the legal mail anyway and said, "We are going to fuck your property up."

285. As harassment defendant Bell forced plaintiff to rewrite the cash slip again, under threats that the officers would otherwise destroy the legal mail instead of sending it to the court.

286. Plaintiff told defendant Bell to stop harassing him and then rewrote the cash slip again.

287. Then defendant Mowery—accompanied by an officer whom plaintiff cannot identify—took plaintiff back to the RHU, recording plaintiff on a handheld camera with audio and video.

288. During the escort to the RHU plaintiff said into the handheld camera: "That box contained sixty copies of the civil complaint and service of process paperwork for Case No. 3:23-cv-239 which is to be mailed to the court. Things seem to get 'lost' in the mail a lot around here."

289. In the hallway of the RHU, defendant Walker was waiting for plaintiff and demanded that plaintiff be put in the strip search cage instead of his RHU cell.

290. Defendant Mowery put plaintiff in the strip search cage and then left to speak with defendant Walker in the hallway.

291. In the hallway defendant Walker asked defendant Mowery, "What? He did it?"

292. Defendant Mowery replied, "Yup. That asshole just mailed those complaints to the court for service of process."

293. From the strip search cage, plaintiff heard this conversation between defendants Walker and Mowery.

294. Immediately defendant Walker came to the strip search cage and told plaintiff, "I heard that you served me the complaint. You are done. We are destroying your property."

295.    Plaintiff informed defendant Walker, "That is not very fair."

296.    Then plaintiff was moved to a cage on J Unit D Pod.

297.    On D Pod, defendants Richards, DeAngelo, and Yount took plaintiff's in-cell property (about three boxes) out of his RHU cell and combined it with all of plaintiff's property that was being stored in the property cage of D Pod (about three boxes).

298.    For approximately two hours, defendants Richards, DeAngelo, and Yount purposefully mixed together plaintiff's in-cell property (legal work, legal notes, notebooks, case law, policies, grievances, request slips, misconducts, poems, books, sentimental family letters and pictures, catalogs, magazines, newspapers, and the like) with his property that was stored in the property cage of D Pod (mostly old request slips, grievances, newspapers, misconduct reports and appeals, catalogs, DOC handbooks, sentimental family letters and pictures, policies, books, and the like) as if they were shuffling a deck of playing cards.

299.    During this time, plaintiff repeatedly told defendants Yount, Richards, and DeAngelo—at least three times—to stop mixing up all of the legal work and property, and informed them that if they would take only the sheet full of books (which plaintiff used as a weight bag) from his in-cell property, then the remaining in-cell property would not exceed the 2-box, in-cell property limit.

300.    In the D Pod cage afterwards, plaintiff began sorting out the legal work, the other papers, and the books, separating the papers he needed as cell contents and the ones that were to be returned to the storage cage.

301. During this time, defendants Yount and DeAngelo informed plaintiff that they were going to destroy two boxes of property and that plaintiff had better figure out which boxes he wanted or else all of the property would be destroyed.

302. As plaintiff frantically continued sorting out the papers, defendant Yount pulled up a trashcan and said that he was going to destroy everything soon.

303. Then defendant Walker came to the cage and screamed: "If you do not go in your cell now, I am going to trash all your property! Fuck your legal work! It is getting destroyed!"

304. Defendant Walker prevented plaintiff from finishing sorting out what property was to be destroyed and what property was to be returned to the storage cage and what property was to be kept as cell contents, and forced plaintiff in his RHU cell with property of defendant Walker's choice, not plaintiff's, so that defendants DeAngelo, Richards, and Yount could destroy the legal work, policies, books, poems, magazines, newspapers, family letters and photographs, and catalogs the plaintiff needed as cell contents or otherwise wanted stored in the property cage.

305. When plaintiff stepped inside his RHU cell, the only thing left there (other than plaintiff's basic-issued clothing, a mattress, and linens) was a copy of the docket sheet for Case No. 3:23-cv-239, the same civil action plaintiff had just mailed to the court to effectuate service of process on defendants Walker and Mohoney, among others.

306. One of the defendants—plaintiff believes it was defendant Walker, who was inside his cell while plaintiff was at R&D—placed the copy of the docket sheet atop the shelf in plaintiff's cell while plaintiff was at R&D, signifying that the interference with and destruction of the property by defendants Walker, Yount, DeAngelo, and Richards

were done as a result of plaintiff's pursuing Case No. 3:23-cv-239 against defendants Walker and Mohoney, among others.

307. While plaintiff was at R&D, one of the defendants stole all of plaintiff's pens bought from commissary, to prevent him from writing to the court.

*Retaliation*

308. On March 8, 2024, plaintiff's family—unaware of a retaliatory suspension of plaintiff's visiting privileges—scheduled a zoom visit with plaintiff for 2:30 p.m. that day.

309. At 2:15 p.m. that day, plaintiff pushed the intercom button in his cell and over the intercom asked an officer, "Are you going to pull me out for my visit this time?"

310. An officer replied taunting plaintiff, "Wah. Wah. [He was hysterically making tormenting crying noises]. File another lawsuit and grievance about it, like you did last time, cry baby bitch. You are not going to a visit."

311. Moments later, an officer—whom plaintiff believes was defendant Mowery—ran up to plaintiff's cell door and then quickly left, saying nothing to plaintiff.

312. Nobody attempted to take plaintiff to his zoom visit that day.

313. The following week, plaintiff's counselor, Mr. Cummins, informed plaintiff that defendant Irwin suspended the family's zoom visits (specifically, plaintiff's sister Karalena Kauffman) because defendant Irwin allegedly investigated plaintiff's grievances and found out later that plaintiff's mother, Shandell Kauffman, was at one of the zoom visits.

314. The denial and suspension of the zoom visits were done in retaliation for plaintiff's grievances about the prior denial of zoom visits on November 23 and 30, 2023,

for his repeated complaints to supervisors, and for his lawsuit against defendants Irwin, Walker, Mohoney, *et. al.* (Case No. 3:23-cv-239).

315.     On the morning of March 26, 2024, plaintiff sent a request slip to Grievance Officer Ms. Biel, complaining about not receiving a pink action return receipt for a grievance plaintiff had filed against defendant DeAngelo on March 19, 2024, regarding the aforementioned interference with property. (The grievance policy, DC-ADM 804, Section 1.C.3., states that "[t]he PINK copy of the DC-804, Part 1 form will be returned to the inmate acknowledging acceptance of the grievance." The PINK copy sets forth the grievance tracking number needed to appeal a grievance.).

316.     Plaintiff at that time did not receive that pink action return receipt, because defendant DeAngelo was withholding it from plaintiff when he handed out mail in the RHU.

317.     On the evening of March 26, 2024, defendant DeAngelo gave plaintiff that pink action return receipt and the aforementioned request slip plaintiff had sent to Grievance Officer Ms. Biel, who replied to the request slip saying that she had given the pink action return receipt to the RHU officers on March 20, 2024, to give to plaintiff.

318.     Later that evening, defendant DeAngelo put a diner tray, a Styrofoam cup of peaches, and an E-bag into plaintiff's cell wicket.

319.     Then plaintiff took his tray and E-bag from his cell wicket, opened the E-bag, and immediately informed defendant DeAngelo that the E-bag was missing the peanut butter again.

320.    In response defendant DeAngelo smashed the cell wicket shut, leaving the Styrofoam cup of peaches inside the cell wicket—where plaintiff could not get it—and stormed off saying, "I do not give a fuck. You filed a grievance."

321.    Plaintiff said: "At least open my wicket so that I can get my peaches."

322.    Defendant DeAngelo replied, "You should not have filed a grievance," and refused to reopen plaintiff's cell wicket, intentionally preventing plaintiff from getting the cup of peaches.

323.    So plaintiff began to eat his diner tray at the desk inside his cell.

324.    As plaintiff was eating, defendant DeAngelo snuck up to his cell door and stole the cup of peaches from his cell wicket, without plaintiff's knowledge of it.

325.    Moments later, defendant DeAngelo came to plaintiff's cell door to collect the diner tray, and plaintiff then saw that defendant DeAngelo had stolen the cup of peaches from the cell wicket.

326.    In protest, plaintiff put his hand inside the cell wicket, preventing defendant DeAngelo from closing it, and demanded that defendant DeAngelo provide a cup of peaches.

327.    Then defendant DeAngelo said, "Fuck you! You filed a grievance and contacted my supervisors!"

328.    Plaintiff pleaded: "I have a medical condition so I need to eat. I will not give the wicket back until I get peaches."

329.    Defendant DeAngelo then left the RHU pod and either (1) got a filthy, empty cup from a trashcan; (2) purposefully dumped out the peaches into a trashcan; or (3) all the above.

330. Moments later, defendant DeAngelo came to plaintiff's cell door carrying the filthy, empty Styrofoam cup, which smelled like garbage.

331. Defendant DeAngelo held the cup to plaintiff's cell window and said, "This one I got just for you."

332. Under a guise that the cup contained peaches, defendant DeAngelo gave plaintiff the empty, filthy cup, and plaintiff allowed defendant DeAngelo to close the cell wicket.

333. Once defendant DeAngelo closed the cell wicket, he walked away saying, "Starve, retard. You should not have filed a grievance on me."

334. This denial of the peanut butter and peaches exacerbated plaintiff's hunger pains from Hyperthyroidism; caused stress, loss of sleep, psychological distress, loss of weight, and anxiety; and caused a chilling effect to his First Amendment right.

335. On March 29, 2024, plaintiff informed defendant Weiland that defendants Walker, Yount, Richards, and DeAngelo had taken property that he needed in his cell to R&D to be destroyed and that he had not chosen that particular property to be destroyed.

336. Defendant Weiland said: "If you want me to get your property from R&D so that you can go through it, then you will have to withdrawal the grievance you filed regarding those issues."

337. Plaintiff refused to withdrawal the grievance, and defendant Weiland refused to recover the property from R&D.

338. Instead, after this interaction with plaintiff, defendant Weiland fabricated his response to plaintiff's grievance, saying that plaintiff had admitted to having no property problems—despite that throughout the entire grievance process plaintiff had consistently

stated these property problems in detail and had explicitly informed defendant Weiland of the property problems on March 29, 2024.

339.    Plaintiff then filed grievance appeals with defendants Varner, Moore, and Gustafson, pointing out that defendant Weiland fabricated the grievance response, refused to recover the property from R&R unless he agreed to withdrawal the grievance, and that he needed to go through his property before it got destroyed at R&R.

340.    Defendants Varner, Moore, and Gustafson upheld defendant Weiland's retaliatory inaction, fabrication of the grievance response, and denial of plaintiff's grievance, allowing the retaliatory destruction of plaintiff's property to consummate at R&D when they could have recovered plaintiff's property from R&D before the destruction of it— thus the post-deprivation remedy was meaningless and inadequate.

341.    As a result of the property interference by defendants Walker, Yount, DeAngelo, and Richards; and the retaliatory inaction of defendants Weiland, Varner, Moore, Gustafson, Irwin, Alexander, and Blicha, plaintiff remained in the RHU without property of his choice and thus suffered psychological and physical deterioration, teeth grinding and headaches from stress, loss of family relationships, loss of fifteen books and $70.00 worth of magazines and catalogs, loss of other property described above, increased anxiety and depression, loss of sleep, stress-related aggravation of hypertension, vomiting, cold sweats, and a chilling effect to his First Amendment right.

*Retaliation, Unlawful Search and Seizure, Cruel and Unusual Punishment*

342.    On May 1, 2024, plaintiff had a familial zoom visit scheduled to occur at 10:30 a.m.

343.    At 10:25 a.m. on that day, defendants Yount and Mohoney came to plaintiff's RHU cell door and defendant Yount said, "Strip for me, faggot."

344.    Without saying anything, Plaintiff complied with the strip search and gave defendants Yount and Mohoney all the clothes on his body through his cell wicket—including his t-shirt, jumpsuit, boxers, and socks.

345.    During this strip search defendant Yount said, "Bend over. Pop that ass," as if plaintiff was a female stripper performing sexual acts for the sexual gratification of defendants Yount and Mohoney.

346.    As required by the strip search practice, plaintiff squatted and coughed.

347.    Defendant Yount said: "I should fuck that asshole with my finger," referring to the aforementioned PREA allegation plaintiff had filed on defendants Mowery, Yount, Mohoney, *et. al.*, concerning their retaliatory abuse of plaintiff on April 25, 2023, and resulting in the investigation by defendants Laver and the ongoing investigation by the Bureau of Investigations and Intelligence.

348.    Despite these abusive strip-search tactics, plaintiff complied with the entire strip search—including lifting his penis, folding his ears, running his fingers through his hair, lifting his feet, conveying his hands and armpits, and so forth.

349.    Up to this time, plaintiff said nothing to defendants Yount and Mohoney.

350.    Through plaintiff's cell wicket, defendants Yount and Mohoney then returned plaintiff's t-shirt, boxers, and socks but did not return his jumpsuit—which plaintiff needed in order to leave his RHU cell for the zoom visit.

351.    Without saying anything plaintiff put on his t-shirt, boxers, and socks and waited for defendants Yount and Mohoney to return his jumpsuit.

352.    Standing outside plaintiff's cell carrying the jumpsuit, defendant Mohoney said, "Strip again. Put your finger in your asshole,"—solely to humiliate, abuse, and retaliate against plaintiff.

353.    Plaintiff replied: "Give me my clothes. You are acting ridiculous. I am filing another PREA."

354.    Defendant Mohoney said: "I will be looking at your ass forever because you will never leave the RHU, you lawsuit filing faggot," referring to Case No. 3:23-cv-239, which plaintiff had recently filed against and served on him, as noted above.

355.    Then defendant Yount took plaintiff's jumpsuit from defendant Mohoney and tied it onto the door handle outside plaintiff's cell.

356.    Defendants Yount and Mohoney left, denying plaintiff's zoom visit.

357.    As retaliatory humiliation, defendants Yount and Mohoney did not cover up one side of plaintiff's cell window during this abusive strip search of plaintiff and thus exposed his naked body to all the other D Pod inmates.

358.    Plaintiff's zoom visit that day was to be conducted on a Kiosk located about twenty feet from his RHU cell and on the same RHU pod in which plaintiff was housed; thus, there was no penological justification for defendants Yount and Mohoney to strip search plaintiff, much less twice and back to back.

359.    Later that day, plaintiff went to a PRC meeting and there informed defendants Gustafson, Blicha, Eisenman, Irwin, Psychological Services Specialist (PSS) Trask, *et. al.,* of the abusive strip search and denial of the zoom visit by defendants Yount and Mohoney and pointed out that the retaliation at SCI-Forest was "out of control" and "rampant."

360. Defendant Eisenman informed plaintiff that he was going to have to answer to a misconduct report written by defendant Yount, and demanded that the plaintiff go back to his RHU cell.

361. In the evening of May 1, 2024—three days before plaintiff was to be released from the RHU to the prison's general population after having been confined in the RHU under fabricated charges since November 22, 2022—defendants Yount, Mohoney, and Marshal conspired to fabricate a misconduct report against plaintiff, accusing him of acting belligerently; refusing to comply with the second, abusive strip search; punching the inside of his cell wicket; threatening them; and using abusive language.

362. This misconduct report by defendants Yount, Mohoney, and Marshal charged plaintiff with four serious misconduct charges: (1) Class 1 #33 Using abusive, obscene or inappropriate language to an employee; (2) Class 1 #35 Refusing to obey an order; (3) Class 1 #15 Threatening an employee; and (4) Class 1 #37 Violation of visiting regulations.

363. Defendants Yount, Mohoney, and Marshal fabricated the misconduct report in retaliation for plaintiff's (1) refusing to succumb to defendant Mohoney's sexual demands to "strip again. Put your finger in your asshole," (2) saying that he was filing another PREA allegation against defendants Yount and Mohoney, (3) filing and pursuing the PREA allegation relating to the abuse on April 25, 2023, and (4) filing and pursuing Case No. 3:23-cv-239 against defendants Mohoney, Walker, *et. al.*

364. Plaintiff has a constitutional right to refuse an abusive strip search practice, to file a PREA allegation, to file a lawsuit, and to refuse to put his own finger in his rectum for the amusement and sexual gratification of defendants Mohoney and Yount.

365.     Before this reprisal by defendants Yount, Mohoney, and Marshal, plaintiff mailed a letter to defendant Harry (specifically on April 15, 2024), complaining about ongoing legal mail interferences by defendant Irwin; retaliatory destruction of property by defendants DeAngelo, Richards, Yount, and Walker; ongoing, retaliatory abuse by defendants Mowery, Yount, Bulers, Spencer, Wells, Knapp, Mohoney, Walker, *et. al.;* and retaliatory fabrications of misconduct reports and misconduct records by defendants Mowery, Yount, Mohoney, Knapp, Walker, Irwin, Gustafson, Blicha, and Alexander resulting in indefinite RHU confinement being imposed in retaliation for plaintiff's grievances and lawsuit.

366.     That letter was referred to the security office at SCI-Forest on April 24, 2024; however, defendant Harry refused to do anything to prevent the ongoing retaliation and abuse complained of, as punishment for plaintiff's lawsuit against her (Case. No. 3:23-cv-239), which plaintiff had filed on September 28, 2023, and which the U.S. Marshals Service served on defendant Harry perhaps in the month of April 2024. (Defendant Harry returned the Waiver of Service Form on May 28, 2024.).

367.     Likewise, defendant Irwin refused to do anything to prevent the ongoing retaliation and abuse previously complained of through a grievance appeal plaintiff had sent to him concerning the abusive retaliation by defendants Yount, Mohoney, Mowery, Bulers, Bauer, Spencer, and Walker which had occurred on April 25, 2023: defendant Irwin denied that grievance appeal on April 19, 2024, and did not discipline the officers, because defendant Irwin wanted, condoned, and encouraged the RHU officers to abuse plaintiff and to retaliate against him.

368.    Defendant Irwin created and maintained this unacceptable, unconstitutional environment for plaintiff at SCI-Forest because of plaintiff's filing of Case. No. 3:23-cv-239, for which defendant Irwin also returned the Waiver of Service Form on May 28, 2024.

*Retaliation*

369.    On May 3, 2024, plaintiff verbally reported the PREA allegation against defendants Yount and Mohoney for the aforepled abusive strip search that occurred on May 1, 2024. Plaintiff reported the PREA allegation to PSS Trask cell side.

370.    On May 6, 2024, plaintiff filed this same PREA allegation with Lieutenant Friedline by sending him a request slip.

371.    At about 6:30 a.m. on May 7, 2024, defendant Yount came to plaintiff's RHU pod (D Pod) to sign up the D Pod inmates for showers.

372.    At this time plaintiff was standing at his cell door ready to inform defendant Yount that he wanted a shower, and nothing was blocking his light, his cell door, etc.—as required by the RHU procedures.

373.    When defendant Yount got to plaintiff's cell door, plaintiff twice told defendant Yount to sign him up for a shower.

374.    Although defendant Yount heard plaintiff's requests for a shower, defendant Yount walked past plaintiff's cell door and refused to put plaintiff on the shower list.

375.    Unaware that defendant Yount had refused to put plaintiff on the shower list, plaintiff then waited at his cell door to be taken to the shower.

376.    Having seen all the other inmates taken to the shower, plaintiff then asked C.O. Bentley why he was being denied a shower.

377.     C.O. Bentley checked the shower list and informed plaintiff that defendant Yount did not sign him up for a shower; however, C.O. Bentley said that she was going to "talk to C.O. Yount," and then went to the top tier of D Pod.

378.     Moments later, from the top tier C.O. Bentley shouted to defendant Yount at the bottom tier, "Why is Kauffman not on the shower list?"

379.     At the bottom tier in front of plaintiff's cell door, defendant Yount replied, "Because Kauffman likes filing PREAs on me."

380.     Therefore, plaintiff remained in the RHU without showers as a result of defendant Yount's retaliation and of the refusal of defendants Harry, Irwin, Varner, Moore, Blicha, Gustafson, Alexander, Walker, Lowe, Lesko, Bell, and Weiland to discipline defendant Yount or otherwise prevent the ongoing vendetta.

*Retaliation, Due Process*

381.     In the afternoon of May 7, 2024, plaintiff put into the prison grievance box grievance 1087348, a grievance concerning the retaliation and abusive strip search by defendants Yount and Mohoney which had occurred on May 1, 2024.

382.     At 8:57 a.m. on May 8, 2024, plaintiff attended a disciplinary hearing with defendant Muntz regarding the misconduct report fabricated by defendant Yount on May 1, 2024.

383.     At this disciplinary hearing plaintiff pled not guilty of the charges and informed defendant Muntz of the abusive strip search, retaliation, sexual abuse, and fabrication of the misconduct report by defendants Yount, Mohoney, and Marshal.

384. Plaintiff's testimony at this disciplinary hearing was consistent with his allegations pled in the present complaint and in grievance 1087348 submitted the day before this hearing.

385. Plaintiff also informed defendant Muntz that the officer who had served him the fabricated misconduct report refused to provide an inmate version form.

386. Plaintiff asked defendant Muntz at this disciplinary hearing to review video footage of the incident—from both the in-cell camera and the J Unit D Pod camera.

387. At first defendant Muntz refused to review the video footage because defendant Muntz said that the camera which records the inside of plaintiff's cell omits audio.

388. However, at this disciplinary hearing plaintiff then persuaded defendant Muntz to review the video footage anyway, on the grounds that the video entirely discredits defendant Yount's report in light of the fact that it shows plaintiff complied with the strip search; plaintiff did not punch the inside of his cell wicket; plaintiff's body language was by no means aggressive; plaintiff's lip movement evidences that he said, "Give me my clothes. You are acting ridiculous, I am filing another PREA"; and defendant Marshal— whom defendant Yount named as being a witness—was not on the pod during the incident.

389. Considering plaintiff's testimony, defendant Muntz informed plaintiff that she was going to review the video footage, and defendant Muntz ordered that the plaintiff sign a DC-141, Part 2(D), to waive the hearing until defendant Muntz reviewed the video. (DC-ADM 801, Section 3.A.2., provides that "... The inmate shall be afforded at least 24 hours to prepare for the hearing from the date and time that the misconduct report is served. The inmate may elect to waive the 24 hours preparation in writing by signing the

DC-141, Part 2(D), Waiver of Disciplinary Procedures. The Hearing Examiner may be involved in the scheduling process where a case is continued or postponed.").

390. Plaintiff was taken back to his RHU cell and given an inmate version form.

391. Once inside of his cell, plaintiff signed the DC-141, Part 2(D), as ordered by defendant Muntz, and returned it to C.O. Whitley, the C.O. who escorted plaintiff to and from this hearing on May 8, 2024.

392. At 1:16 p.m. later that day, Grievance Officer L. Reeher officially filed grievance 1087348 into the grievance tracking system (*i.e.*, the grievance plaintiff had put into the grievance box on May 7, 2024, concerning the retaliation, the abusive strip search, and the fabricated misconduct report by defendants Yount, Mohoney, Marshal).

393. The prison administration and/or officers brought that grievance to defendant Muntz's attention.

394. Then outside of the plaintiff's presence defendant Muntz reviewed the video footage of the incident concerning the retaliation and sexual abuse claims alleged in that grievance and at the disciplinary hearing on May 8, 2024.

395. Pursuant to the video footage, defendant Muntz saw not only substantial merit in plaintiff's retaliation and sexual abuse claims against defendants Yount and Mohoney, but also plaintiff's innocence with respect to each and every misconduct charge fabricated by defendants Yount, Mohoney, and Marshal.

396. On May 10, 2024, plaintiff attended another disciplinary hearing concerning the retaliatory misconduct report fabricated by defendants Yount, Mohoney, and Marshal.

397. To this disciplinary hearing plaintiff brought with him an inmate version form that had his consistent testimony written thereon.

398. During this disciplinary hearing defendant Minich tried to give the inmate version form to defendant Muntz, but defendant Muntz snapped: "That is not going in the record."

399. Defendant Muntz then informed plaintiff, "You are going to stay in the RHU until you learn not to file grievances and lawsuits against staff."

400. Then plaintiff received a fabricated, handwritten Part 2(B), where defendant Muntz entirely omitted the disciplinary hearing that occurred on May 10, 2024, the inmate version form, the PREA allegation, and the retaliation claim; and alleged that defendant Muntz had denied the plaintiff's request to have the video reviewed; and alleged that the plaintiff was guilty of Class 1 #15 and #33 because she "believe[d] Yount's report over [plaintiff's] denial"; and sentenced plaintiff to serve 60 days in punitive segregation.

401. Defendant Muntz replaced in this Part 2(B) plaintiff's PREA allegation and retaliation claim with a fabrication that at the disciplinary hearing plaintiff testified to having called defendants Yount and Mohoney "weird" right before they had fabricated the misconduct charges against plaintiff in retaliation for having actually said, "Give me my clothes. You are acting ridiculous. I am filing another PREA."

402. Defendant Muntz fabricated this Part 2(B) to interfere with the present civil action, despite that plaintiff's testimony against defendants Yount, Mohoney, and Marshal was set forth consistently in grievance 1087348 filed on May 7, 2024, and at the disciplinary hearing on May 8, 2024.

403. Plaintiff filed an administrative misconduct appeal with defendants Gustafson, Blicha, Alexander, and Eisenman, pointing out—as described in the present complaint—

each and every procedural defect, fabrication, omission, and clearly erroneous factual finding in connection with both disciplinary hearings conducted by defendant Muntz.

404.    Through the misconduct appeal, plaintiff informed defendants Gustafson, Blicha, Alexander, and Eisenman about defendant Muntz's attempt to cover-up the sexual abuse and retaliation by defendants Yount and Mohoney and about defendant Muntz's retaliatory imposition of the 60-day punitive segregation sentence.

405.    On May 28, 2024, defendants Gustafson, Blicha, Alexander, and Eisenman condoned and directed the ongoing vendetta by defendants Yount, Mohoney, Marshal, and Muntz, by maliciously and sadistically upholding the retaliatory 60-day sentence and denying plaintiff's misconduct appeal on the grounds that "a PRC appeal is not a rehearing of the facts of a misconduct, rather, it is a review for procedural errors" and that plaintiff was "found guilty based on the report being credible to HEX [defendant Muntz] along with video footage [that is, video footage that defendant Muntz lied about not reviewing]."

*Supervisory Liability, Retaliation, Due Process*

406.    On May 29, 2024, plaintiff sent another letter to defendant Harry, pointing out that defendants Gustafson, Blicha, Alexander, Muntz, Eisenman, Irwin, Yount, Mohoney, and Marshal were conspiring to destroy and to fabricate evidence of retaliation and sexual abuse by defendants Yount and Mohoney in order to conceal a conspiracy of confining plaintiff in the RHU under fabricated misconduct charges until he stopped complaining about staff misconduct.

407.     Defendant Harry did not remedy the ongoing, retaliatory 60-day DC sentence or the ongoing fabrication and destruction of the misconduct record by defendants Muntz, Irwin, Gustafson, Blicha, Alexander, Eisenman, and Yount.

408.     Defendant Harry's inaction was due to plaintiff's filing of Case. No. 3:23-cv-239 against her; for that case, defendant Harry returned the Waiver of Service Form on May 28, 2024.

*Misuse of Force, Retaliation, Free Religious Exercise*

409.     During mail pickup at about 6:15 a.m. to 6:45 a.m. on June 10, 2024, defendant Crose took from plaintiff's cell door his informal complaint addressed to the Inspector General (IG) regarding ongoing constitutional violations by the RHU officers.

410.     Shorty after defendant Crose collected breakfast trays that morning, plaintiff called out to him, "Make sure my complaint to the IG goes into the mailbox. It concerns you and your coworkers' violating my rights."

411.     Defendant Crose shouted back, "I am going to make you my bitch today, Kauffman."

412.     At 4:52 p.m. later that day, defendant Crose came to plaintiff's cell door to collect his diner tray.

413.     With defendant Crose was a trash can because he was discarding other inmates' garbage.

414.     Plaintiff put a brown paper bag of garbage into his cell wicket so that defendant Crose could put it into the trashcan, which defendant Crose set about one foot from plaintiff's cell door.

415.     Defendant Crose said: "You just snitched on us to the IG. I will throw that trash on you."

416.     Then plaintiff put his empty diner tray into the cell wicket and replied, "Just take the trash and tray so that I can pray or else I will file a grievance on you."

417.     In response defendant Crose forcefully pushed the bag of garbage through plaintiff's cell wicket—maliciously and sadistically punching plaintiff's testicles in the process—and then dumped the garbage all over plaintiff and all over the inside of his cell.

418.     Plaintiff had to stop this assault by pushing the garbage bag out of his cell wicket.

419.     As a result, plaintiff's garbage bag—with some remaining garbage therein—lay on the floor outside of plaintiff's cell.

420.     At 4:57 p.m. defendant Crose picked up the garbage bag, put it into plaintiff's cell wicket, and said: "Once you start sucking your God's dick, I am going to spray you [with pepper spray] and then dump this garbage all over you, snitch," and left.

421.     Approximately two minutes later, defendant Crose came back to plaintiff's cell door, to check if plaintiff had begun to pray.

422.     At this time plaintiff was on the ground praying but heard defendant Crose approaching his cell door in an attempt to assault plaintiff with garbage and/or spray him with pepper spray.

423.     Hence, plaintiff had to stop praying and had to go to his cell door and block his cell wicket in order to prevent defendant Crose's assault.

424.     Defendant Crose found humor in inhibiting plaintiff's prayers and thus taunted, "No praying for you unless you want sprayed and trash thrown all over you," and left.

425.    Plaintiff began to pray on his knees again.

426.    A few minutes later, however, defendant Crose again crept up to plaintiff's cell door attempting to assault plaintiff while he was praying.

427.    Once again, plaintiff heard defendant Crose approaching and had to stop praying in order to defend himself against defendant Crose's retaliatory, premeditated assault.

428.    Defendant Crose said: "I bet you were praying to the IG, you fucking pussy. I am going to kill you."

429.    Plaintiff demanded defendant Crose to stop mocking his Christian religion and to stop preventing his prayers.

430.    In response, defendant Crose mocked, "Go ahead! Suck God's dick, you faggot! I am going to spray the fuck out of you!" and left.

431.    Plaintiff began to pray on his knees again.

432.    At 5:11 p.m. defendant Crose snuck up to plaintiff's cell door, quickly opened his cell wicket, and dumped the bag of garbage all over plaintiff while he was praying on his knees at the cell door.

433.    Defendant Crose informed plaintiff that "Your God hates snitches," referring to plaintiff's complaint sent to the IG that morning.

434.    Plaintiff has a constitutional right to practice the religion in which he was raised: Christianity—which entails praying to his God.

435.    That night, plaintiff slipped and fell on soap residue that remained on his cell floor as a result of this garbage assault by defendant Crose, hit his right elbow on the ground and his head on the end of his bed, and sustained serious injuries, including substantial pain and soreness in his body persisting for three weeks causing inability to

exercise or sleep, loss of consciousness, a concussion, a lump on his head, cognitive dysfunction, disabling migraine headaches causing inability to eat or sleep, dizzy spells, exacerbation of preexisting in injuries to his right elbow and head, fear of dying, increased PTSD and night terrors, flashbacks, and humiliation.

436.    From the substantial burden to plaintiff's religious practices, plaintiff suffered teeth grinding from stress, severe anxiety and depression, loss of freedom and of liberty to practice his religion, mental anguish, psychological trauma, psychological deterioration, stress-induced headaches and vomiting, and infringements of his First Amendment right.

*Due Process, Retaliation*

437.    Regarding the retaliatory misconduct charges or sentence by defendants Yount, Mohoney, Marshal, and Muntz, the plaintiff filed a misconduct appeal with defendant Irwin, pointing out that defendants Gustafson, Blicha, Alexander, and Eisenman retaliated against him for having filed Case No. 3:23-cv-239 against defendants Harry, Irwin, Blicha, Gustafson, *et. al.* (who all returned the Waiver of Service Form on the very same day that they denied plaintiff's misconduct appeal, May 28, 2024) by intentionally upholding a clearly retaliatory punitive segregation sentence; by encouraging and condoning the retaliation; and by ignoring all of the issues set forth in the first level appeal, including "procedural errors, intentional fabrications, destruction of records, ongoing constitutional violations, and clearly erroneous factual findings in light of (1) the video evidence on both the cell camera and the J Unit D Pod camera, viz., on May 1, 2024, from 10:20 a.m. to 10:35 a.m. (Preserve that video for litigation), (2) the fact that C.O. Marshal was not on the pod during the event and did not witness the event, (3) the

Page 66 of 97

destruction of the inmate version form by Muntz, (4) the fabrication of the Part 2(B) by HEX Muntz, wherein she fabricated that she never reviewed video, in face of clear evidence that I signed the Part 2(B) for review of video and that she did then review video, and (5) the fact that the constitutional violations HEX Muntz saw in the video evidence compelled her to fabricate and destroy the misconduct record, in hopes to hamper litigation and conceal the retaliatory DC sentence." (quoted from plaintiff's misconduct appeal to defendant Irwin).

438.     While the misconduct appeal was pending, plaintiff sent approximately twenty request slips, grievances, grievance appeals, or letters to PRC, Inmate Records, CA2 Kunseinman, Grievance Officer Biel and Reeher, and the Inspector General and to defendants Irwin, Moslak, and Harry, requesting copies of the misconduct record, which the plaintiff needed in order to appeal the misconduct to final review in accordance with DC-ADM 801, and complaining that SCI-Forest staff were conspiring to destroy and to conceal the record and evidence concerning the misconduct report in the hopes to hamper a lawsuit.

439.     In response, the staff members or defendants named above either (1) shifted the responsibility to provide the copies of the record onto the next staff members and ordered plaintiff to send a request slip to them instead; (2) plainly refused to provide the copies of the record on the grounds that plaintiff had the original record; or (3) fabricated that plaintiff had never sent a request slip for the copies of the record.

440.     On June 17, 2024, one day before plaintiff's deadline to appeal defendant Irwin's appeal response was up, plaintiff received the misconduct record and defendant Irwin's appeal response.

441.    The misconduct record provided on June 17, 2024, however, shows that defendants Irwin, Blicha, Gustafson, Muntz, and Yount conspired to oust and to destroy from the misconduct record the original, handwritten, fabricated Part 2(B) provided to plaintiff on May 10, 2024, and then to replace that Part 2(B) with an altered, fabricated, typed Part 2(B).

442.    The altered, fabricated, typed Part 2(B) signed by defendant Muntz and provided on June 17, 2024 (hereinafter referred to as the "altered Part 2(B)") differs from the original, fabricated, handwritten Part 2(B) signed by defendant Muntz and provided on May 10, 2024 (hereinafter referred to as the "original Part 2(B)"), as follows: (1) The altered Part 2(B) says plaintiff signed a Part 2(D) Waiver Form, whereas the original Part 2(B) does not; (2) The altered Part 2(B) says the hearing on May 8, 2024, was continued and resumed on May 10, 2024, whereas the original Part 2(B) does not; (3) The altered Part 2(B) includes an additional fabrication alleging that plaintiff testified that "he had no reason to make those comments to the officer because he was compliant," whereas the original Part 2(B) does not; and (4) The altered Part 2(B) includes in the appendices plaintiff's inmate version form and Part 2(D) Waiver Form, whereas the original Part 2(B) does not.

443.    Both the altered Part 2(B) and the original Part 2(B) omit plaintiff's claims of sexual abuse and retaliation by defendants Yount and Mohoney, and replace those claims with a fabrication that at the hearing plaintiff testified to having called defendants Yount and Mohoney "weird" right before they had fabricated the misconduct charges in retaliation for having actually said, "Give me my clothes. You are acting ridiculous. I am filing another PREA."

444.    In defendant Irwin's misconduct appeal response, which as noted above plaintiff received together with the altered Part 2(B), defendant Irwin upheld the retaliatory 60-day DC sentence and the retaliatory misconduct report on the grounds that "no violations of the DC-ADM 801 have occurred" and that he found "no persuasive basis from which to conclude that HEX [defendant Muntz] erred in conducting the hearing" and that "the procedures followed were in complete accordance with the DC-ADM 801"—a sham to conceal the prior and ongoing retaliation and to make plaintiff suffer in the RHU (until he stopped complaining about staff misconduct) in retaliation for plaintiff's having filed Case No. 3:23-cv-239 against defendants Harry, Irwin, Blicha, Moslak, *et. al.* concerning a prior, retaliatory cover-up in which defendants Blicha, Gustafson, Alexander, and Irwin had fabricated a misconduct appeal response to say that plaintiff had pled guilty of assaulting staff, in order to justify and conceal a retaliatory imposition of RHU conferment.

445.    The United States Marshals served defendant Irwin the complaint regarding Case No. 3:23-cv-239, and defendant Irwin returned the Waiver of Service Form on May 28, 2024.

446.    Plaintiff then filed a final level misconduct appeal with defendant Moslak, pointing out that he had two fabricated Part 2(B)s—the original Part 2(B) and the altered Part 2(B)—because, he explained, defendants Irwin, Gustafson, Blicha, Alexander, Muntz, and Yount conspired to oust and to destroy the original Part 2(B) from the record and to replace it with an altered Part 2(B) in an attempt to conceal the sexual abuse and retaliation by defendants Yount and Mohoney as well as the retaliatory imposition of DC confinement by defendant Muntz.

447.    In this final level appeal, plaintiff raised for review each and every issue (as described in this complaint) relating to this misconduct report and the hearings, and enclosed a facsimile of the grievance he had submitted on May 7, 2024, to prove his consistent statements with respect to his claims of sexual abuse and retaliation, and to prove the fabrication of the Part 2(B).

448.    On July 2, 2024, defendant Moslak upheld the retaliatory 60 day DC sentence by defendant Muntz; and the retaliatory misconduct report by defendants Mohoney, Yount, and Marshal—on the grounds that the issues raised in plaintiff's appeal were "addressed by PRC [defendants Blicha, Gustafson, and Alexander] and the superintendent [defendant Irwin]," that defendant Moslak concurred with their responses, and that "the procedures followed were in complete accordance with DC-ADM 801."

449.    The grounds upon which defendant Moslak denied plaintiff's misconduct appeal are contrary to the misconduct record: neither PRC (defendants Blicha, Alexander, and Gustafson) nor defendant Irwin addressed all of, if not any of, the issues raised in the appeals, and plaintiff was provided two fabricated Part 2(B)s—thus, the procedures taken were not in complete accordance with DC-ADM 801.

450.    Defendant Moslak denied plaintiff's misconduct appeal on frivolous, fabricated grounds, refused to dismiss or expunge the misconduct charges, and refused to discipline defendants Irwin, Blicha, Gustafson, Alexander, Yount, Mohoney, and Muntz as retaliation and punishment against plaintiff for having filed Case No. 3:23-cv-239 against defendant Moslak, among others, for defendant Moslak's prior refusal to discipline defendants Irwin, Gustafson, Blicha, *et. al.*, in connection with a prior, retaliatory cover-

up in which defendants Irwin, Gustafson, and Blicha had fabricated a misconduct appeal response to say that plaintiff had pled guilty of assaulting staff.

451.    The United States Marshals served defendant Moslak the complaint relating to Case No. 3:23-cv-239, and defendant Moslak returned the Waiver of Service Form on May 28, 2024.

452.    As a result of the fabricated misconduct report by defendants Yount, Mohoney, and Marshal; the retaliatory DC sentence and denial of due process by defendant Muntz; the retaliatory cover-up, and refusal to correct the retaliatory DC sentence, by defendants Blicha, Irwin, Alexandra, Gustafson, Eisenman, Moslak, and Harry or otherwise prevent the ongoing vendetta by these defendants, plaintiff suffered atypical and significant hardship during the resulting up day sentence in punitive segregation, as follows: (1) The plaintiff was denied privileges that ordinary prisoners have in the prison's general population, including adequate recreation and yard, tablet, TV, visits, phone calls, commissary, property, educational classes, law library, daily showers, GLP pay periods, and Kiosk; (2) The plaintiff lost his freedom of movement, liberty, and socializing causing back and leg pain; (3) The plaintiff was denied medical care for thyroid problems, among other injuries described throughout this complaint, causing increased heart palpitations, inability to breathe, fainting, erectile dysfunction, inability to exercise, loss of hair, hunger pains, diminished mobility, etc.; (4) The plaintiff's wrists are cut up and scarred from being handcuffed every time he left his RHU cell; (5) The officers repeatedly ransacked plaintiff's cell and stole his legal work and pens when he left his RHU cell for medical appointments; (6) The plaintiff was confined in the RHU with deranged inmates screaming, banging, and arguing all day and night causing loss of

sleep, stress, migraine headaches, and anxiety; (7) The RHU officers repeatedly spit in, urinated in, tampered with, and stole plaintiff's food causing substantial weight loss, weakness, loss of sleep, and hunger pains; (8) The plaintiff's cell camera constantly recorded him using the toilet, sleeping, changing his clothes, etc. causing loss of privacy; (9) The plaintiff's RHU cell had no locker or shelves, so plaintiff used the bed to hang wet clothes on and thus slept on the ground causing back and leg pain and bug bites.

453.    Plaintiff's confinement in the RHU as a result of the retaliatory misconduct charges and sentence caused loss of sleep and migraine headaches from the constantly illuminated cell; teeth grinding from stress resulting in a tooth infection; vomiting from anxiety; respiratory illness from mold exposure; permanent sensory deprivation; a degraded reputation from the stigmatic misconduct charges; a skin rash; itchiness and loss of hair from inadequate cosmetics causing bleeding and infections; a diminished quality of life; physical and mental deterioration; permanent knee and back pain; vitamin D deficiency; and severe and increased depression, anxiety, paranoia, and psychotic episodes.

454.    The abusive strip search practice by defendants Yount and Mohoney caused a chilling effect to plaintiff's visiting privileges, his filing grievances and lawsuits, and his reporting PREA allegations; and caused plaintiff's need for PREA counseling; paranioa, anxiety, PTSD, panic attacks, and night terrors stemming from fear of being raped by the RHU officers; invasion of bodily privacy; psychological trauma and deterioration; severe depression; chest pain, heart palpitations, and headaches associated with panic attacks, mental anguish, and distress; teeth grinding, waking up in cold sweats, and vomiting associated with stress, anxiety, and night terrors; and humiliation.

*Supervisory Liability*

455.     All the defendants carried out or allowed an overarching campaign of harassment and unprovoked violence as retaliation for plaintiff's engagement in constitutionally protected conduct—specifically, filing grievances, filing PREA allegations, filing a civil action, attending PREA counseling, and refusing to perform sexual acts for the defendants' amusement and sexual gratification.

456.     Defendants Harry, Lowe, Moore, Varner, Irwin, Eisenman, Blicha, Alexander, Gustafson, Moslak, Walker, Weiland, Jordan, Smith, and Bell maintained, allowed, and condoned an unacceptable, violent environment for, and treatment of, plaintiff in the Pennsylvania Department of Corrections as a result of their unconstitutional policies, practices, and customs of inadequate discipline of subordinate employees, inadequate training and screening of subordinate employees, and inadequate investigation of ongoing constitutional violations.

457.     Defendants Harry, Lowe, Moore, Varner, Irwin, Eisenman, Blicha, Alexander, Gustafson, Moslak, Walker, Weiland, Jordan, Smith, and Bell intentionally maintained, allowed, and condoned an unacceptable, violent environment for, and treatment of, plaintiff in the Pennsylvania Department of Corrections because they wanted him to suffer for filing a civil action against prison officials, Case No. 3:23-cv-239.

*Claims for Relief*

458.     The actions of defendants Yount, Mowery, Mohoney, Bulers, Bauer, Walker, John Doe #1, John Doe #2, and Spencer in using physical force and sexual abuse against plaintiff without need or provocation, or in failing to prevent the abuse, were done

maliciously and sadistically and constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

459.    The actions of defendants Yount, Mowery, Mohoney, Bulers, Bauer, Walker, John Doe #1, John Doe #2, and Spencer in using physical force and sexual abuse against plaintiff without need or provocation, or in failing to prevent the abuse, constituted retaliation for plaintiff's attempt to acquire PREA counseling in violation of the First Amendment to the United States Constitution.

460.    The actions of defendants Yount, Mowery, Mohoney, Bulers, Bauer, Walker, John Doe #1, John Doe #2, and Spencer in using physical force and sexual abuse against plaintiff without need or provocation, or in failing to prevent the abuse, constituted the torts of intentional infliction of emotional distress, and assault and battery under the law of Pennsylvania.

461.    The actions of defendants Yount, Mowery, Mohoney, Bulers, Bauer, Walker, John Doe #1, John Doe #2, and Spencer in using physical force and sexual abuse against plaintiff without need or provocation, or in failing to prevent the abuse, constituted a conspiracy to violate plaintiff's Eighth Amendment and First Amendment rights.

462.    The failure of defendants Strick, Crystal, Watson, John Doe #3, Irwin, Varner, Moore, Smith, and Harry to provide correct diagnostic testing and medical care for the injuries sustained from the officers' abuse that occurred on April 25, 2023, constituted deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution.

463.    The failure of defendant Strick to provide correct diagnostic testing and medical care for the injuries sustained from the officers' abuse that occurred on April 25, 2023,

constituted retaliation for reporting the officers' abuse in violation of the First Amendment to the United States Constitution.

464. The failure of defendants Strick, Crystal, Watson, John Doe #3, Irwin, Varner, Moore, Smith, and Harry to provide correct diagnostic testing and medical care for the injuries sustained from the officers' abuse that occurred on April 25, 2023, constituted the torts of negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress under the law of Pennsylvania.

465. The actions/inactions of defendants Mowery, Mohoney, Irwin, Varner, Moore, Alexander, Collins, Gustafson, Blicha, Moslak, and Harry in fabricating a misconduct report against plaintiff, or imposing a 150 day punitive segregation sentence for the misconduct report, or fabricating the disposition of the misconduct charges, or upholding the retaliatory fabrication of the disposition of the misconduct charges and the imposition of the retaliatory 150 day punitive segregation sentence, constituted retaliation for reporting the officers' abuse in violation of the First Amendment to the United States Constitution.

466. The actions/inactions of defendants Mowery, Mohoney, Irwin, Varner, Moore, Alexander, Collins, Gustafson, Blicha, Moslak, and Harry in fabricating a misconduct report against plaintiff, or imposing a 150 day punitive segregation sentence for the misconduct report, or fabricating the disposition of the misconduct charges, or upholding the retaliatory fabrication of the disposition of the misconduct charges and the imposition of the retaliatory 150 day punitive segregation sentence, constituted a conspiracy to violate plaintiff's First Amendment right.

467.    The actions/inactions of defendants Mowery, Mohoney, Irwin, Varner, Moore, Alexander, Collins, Gustafson, Blicha, Moslak, and Harry in fabricating a misconduct report against plaintiff, or imposing a 150 day punitive segregation sentence for the misconduct report, or fabricating the disposition of the misconduct charges, or upholding the retaliatory fabrication of the disposition of the misconduct charges and the imposition of the retaliatory 150 day punitive segregation sentence, in retaliation, constituted the torts of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under the law of Pennsylvania.

468.    The actions of defendants Yount, Minich, and Collins in destroying plaintiff's inmate version form, instead of putting it in the record, constituted retaliation for reporting the officers' abuse in violation of the First Amendment to the United States Constitution.

469.    The actions of defendants Yount, Minich, and Collins in destroying plaintiff's inmate version form, instead of putting it in the record, constituted a conspiracy to violate plaintiff's First Amendment right.

470.    The actions of defendants Yount, Minich, and Collins in destroying plaintiff's inmate version form, instead of putting it in the record, constituted the tort of negligence under the law of Pennsylvania.

471.    The actions of defendants Collins, Irwin, Varner, Moore, Alexander, Gustafson, Blicha, Moslak, and Harry in conducting or upholding a biased disciplinary hearing, finding plaintiff guilty of the misconduct charges despite all the evidence plaintiff presented against the officers, and providing or condoning a fabricated disposition of the misconduct charges and a fabricated misconduct report, to conceal a retaliatory

imposition of punitive confinement, denied plaintiff due process of law in violation of the Fourteenth Amendment to the United States Constitution.

472.     The actions of defendants Collins, Irwin, Varner, Moore, Alexander, Gustafson, Blicha, Moslak, and Harry in conducting or upholding a biased disciplinary hearing, finding plaintiff guilty of the misconduct charges despite all the evidence plaintiff presented against the officers, and providing or condoning a fabricated disposition of the misconduct charges and a fabricated misconduct report, to conceal a retaliatory imposition of punitive confinement, constituted a conspiracy to violate plaintiff's Fourteenth Amendment right.

473.     The actions of defendant Laver in threatening plaintiff with criminal charges, fabricating the police report to cover-up the officers' abuse and to interfere with the present civil action, and refusing to carry out his legal duty to have criminal charges pressed on defendants Mowery, Yount, Mohoney, Bulers, Bauer, Spencer, Walker, John Doe #1, and John Doe #2 constituted retaliation for reporting the officers' abuse and for informing him of plaintiff's plan to file a civil action in violation of the First Amendment to the United States Constitution.

474.     The actions of defendant Laver in threatening plaintiff with criminal charges, fabricating the police report to cover-up the officers' abuse and to interfere with the present civil action, and refusing to carry out his legal duty to have criminal charges pressed on defendants Mowery, Yount, Mohoney, Bulers, Bauer, Spencer, Walker, John Doe #1, and John Doe #2 constituted the tort of negligence under the law of Pennsylvania.

475.    The actions of defendants Bauer, Spencer, and John Doe #4 in trashing plaintiff's cosmetics and sheets, and in urinating in plaintiff's cell and on his law book, or in failing to intervene to prevent the destruction of property, constituted retaliation for reporting the officers' abuse to defendant Laver in violation of the First Amendment to the United States Constitution.

476.    The actions of defendants Bauer, Spencer, and John Doe #4 in trashing plaintiff's cosmetics and sheets, and in urinating in plaintiff's cell and on his law book, or in failing to intervene to prevent the destruction of property, constituted an unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution.

477.    The actions of defendants Bauer, Spencer, and John Doe #4 in trashing plaintiff's cosmetics and sheets, and in urinating in plaintiff's cell and on his law book, or in failing to intervene to prevent the destruction of property and inhuman cell conditions, constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

478.    The actions of defendants Bauer, Spencer, and John Doe #4 in trashing plaintiff's cosmetics and sheets, and in urinating in plaintiff's cell and on his law book, or in failing to intervene to prevent the destruction of property and inhuman cell conditions, constituted a conspiracy to violate plaintiff's First Amendment, Fourth Amendment, and Eighth Amendment rights

479.    The actions of defendants Bauer, Spencer, and John Doe #4 in trashing plaintiff's cosmetics and sheets, and in urinating in plaintiff's cell and on his law book, or in failing to intervene to prevent the destruction of property and inhuman cell conditions,

constituted the torts of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under the law of Pennsylvania.

480. The failure of defendants Bauer, Spencer, John Doe #4, Varner, Moore, Lowe, and Irwin to provide a meaningful, adequate post-deprivation remedy for the destruction of property by defendants Bauer, Spencer, and John Doe #4 denied plaintiff due process of law in violation of the Fourteenth Amendment to the United States Constitution.

481. The actions of defendants Spencer, Fredrick, Lesko, and John Doe #5 in moving plaintiff in a broken, filthy grind-up cell constituted retaliation for plaintiff's attempt to acquire PREA counseling in violation of the First Amendment to the United States Constitution.

482. The actions of defendants Spencer, Fredrick, Lesko, and John Doe #5 in moving plaintiff in a broken, filthy grind-up cell constituted cruel and unusual punishment and inhuman cell conditions in violation of the Eighth Amendment to the United States Constitution.

483. The actions of defendants Spencer, Fredrick, Lesko, and John Doe #5 in moving plaintiff in a broken, filthy grind-up cell constituted the torts of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under the law of Pennsylvania.

484. The actions of defendants Spencer, Lesko, and John Doe #5 in pulling plaintiff's hands through the cell wicket until his wrists broke and bled, or in failing to prevent the misuse of force, were done maliciously and sadistically and constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

485.    The actions of defendants Spencer, Lesko, and John Doe #5 in pulling plaintiff's hands through the cell wicket until his wrists broke and bled, or in failing to prevent the misuse of force, constituted retaliation for plaintiff's attempt to acquire PREA counseling for the officers' abuse in violation of the First Amendment to the United States Constitution.

486.    The actions of defendants Spencer, Lesko, and John Doe #5 in pulling plaintiff's hands through the cell wicket until his wrists broke and bled, or in failing to prevent the misuse of force, constituted a conspiracy to violate plaintiff's First Amendment and Eighth Amendment rights.

487.    The actions of defendants Spencer, Lesko, and John Doe #5 in pulling plaintiff's hands through the cell wicket until his wrists broke and bled, or in failing to prevent the misuse of force, constituted the torts of intentional infliction of emotional distress, and assault and battery under the law of Pennsylvania.

488.    The failure of defendants McGill, Varner, Moore, Harry, and Sharp to provide plaintiff diagnostic testing, a referral to a qualified doctor, or medical care for the injuries sustained from the misuse of force by defendants Spencer, Lesko, and John Doe #5 constituted deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution.

489.    The failure of defendant McGill to provide plaintiff diagnostic testing, a referral to a qualified doctor, or medical care for the injuries sustained from the misuse of force by defendants Spencer, Lesko, and John Doe #5 constituted retaliation for reporting the officers' abuse in violation of the First Amendment to the United States Constitution.

490.   The failure of defendants McGill, Varner, Moore, Harry, and Sharp to provide plaintiff diagnostic testing, a referral to a qualified doctor, or medical care for the injuries sustained from the misuse of force by defendants Spencer, Lesko, and John Doe #5 constituted the torts of negligent infliction of emotional distress and negligence under the law of Pennsylvania.

491.   The actions of defendants Burkhart, Carbon, John Doe #6, Walker, Varner, Moore, and Blicha in destroying or allowing the destruction of plaintiff's legal notebooks were done as an unconstitutional policy of defendants Harry and Irwin and constituted retaliation for plaintiff's attempt to acquire PREA counseling in violation of the First Amendment to the United States Constitution.

492.   The actions of defendants Burkhart, Carbon, John Doe #6, Walker, Varner, Moore, and Blicha in destroying or allowing the destruction of plaintiff's legal notebooks were done as an unconstitutional policy of defendants Harry and Irwin and constituted unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution.

493.   The actions of defendants Burkhart, Carbon, John Doe #6, Walker, Varner, Moore, and Blicha in destroying or allowing the destruction of plaintiff's legal notebooks were done as an unconstitutional policy of defendants Harry and Irwin and constituted a conspiracy to violate plaintiff's First Amendment and Fourth Amendment rights.

494.   The actions of defendants Burkhart, Carbon, John Doe #6, Walker, Varner, Moore, and Blicha in destroying or allowing the destruction of plaintiff's legal notebooks were done as an unconstitutional policy of defendants Harry and Irwin and constituted the tort of negligence under the law of Pennsylvania.

495.    The actions of defendants Burkhart, Carbon, John Doe #6, Walker, Varner, Moore, and Blicha to provide a meaningful, adequate post-deprivation remedy for the destruction of legal notebooks by defendants Burkhart, Carbon, John Doe #6, and Walker denied plaintiff due process of law in violation of the Fourteenth Amendment to the United States Constitution.

496.    The actions of defendants Yount, Lowe, and Lesko in stealing the peanut butter from plaintiff's medical diet bag constituted retaliation for filing a grievance in violation of the First Amendment to the United States Constitution.

497.    The actions of defendant Lowe in trashing the remote controls for the TVs, denying the RHU inmates their allotted TV time, and falsely labeling plaintiff as being a "pedophile" in front of other inmates constituted retaliation for filing a grievance in violation of the First Amendment to the United States Constitution.

498.    The actions of defendants C.O. Moore, Walker, Lowe, Irwin, Richards, Mowery, Fredrick, Lesko, and Crose in interfering with plaintiff's familial visits, and in fabricating the records to conceal the interferences, constituted retaliation for filing grievances and a lawsuit in violation of the First Amendment to the United States Constitution.

499.    The actions of defendants C.O. Moore, Walker, Lowe, Irwin, Richards, Mowery, Fredrick, Lesko, and Crose in interfering with plaintiff's familial visits, and in fabricating the records to conceal the interferences, constituted a conspiracy to violate plaintiff's First Amendment right.

500.    The actions of defendants C.O. Moore, Walker, Lowe, Irwin, Richards, Mowery, Fredrick, Lesko, and Crose in interfering with plaintiff's familial visits, and in fabricating

the records to conceal the interferences, constituted the tort of negligence under the law of Pennsylvania.

501.    The actions of defendants Walker, Yount, DeAngelo, and Richards in mixing up, destroying, and interfering with plaintiff's property, and of defendants Weiland, Varner, Moore, and Gustafson in refusing to remedy the destruction of property, constituted retaliation for filing and pursuing a civil action and grievance in violation of the First Amendment to the United States Constitution.

502.    The actions of defendants Walker, Yount, DeAngelo, and Richards in mixing up, destroying, and interfering with plaintiff's property, and of defendants Weiland, Varner, Moore, and Gustafson in refusing to remedy the destruction of property, constituted an unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution.

503.    The actions of defendants Walker, Yount, DeAngelo, and Richards in mixing up, destroying, and interfering with plaintiff's property, and of defendants Weiland, Varner, Moore, and Gustafson in refusing to remedy the destruction of property, constituted negligence under the law of Pennsylvania.

504.    The actions of defendants Walker, Yount, DeAngelo, Richards, Weiland, Varner, Moore, and Gustafson in denying plaintiff an adequate, meaningful post-deprivation remedy for the property destroyed denied plaintiff due process of law in violation of the Fourteenth Amendment to the United States Constitution.

505.    The actions of defendants Walker, Yount, DeAngelo, Richards, Weiland, Varner, Moore, and Gustafson in interfering with plaintiff's property and/or refusing to remedy the destruction of property and/or denying plaintiff an adequate, meaningful post-

deprivation remedy for the property destroyed constituted a conspiracy to violate plaintiff's First Amendment, Fourth Amendment, and Fourteenth Amendment rights.

506. The actions of defendants DeAngelo, Reddinger, and Bell in searching and reading plaintiff's outgoing legal mail denied plaintiff's right of free speech in violation of the First Amendment to the United States Constitution.

507. The actions of defendants DeAngelo, Reddinger, and Bell in searching and reading plaintiff's outgoing legal mail constituted an unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution.

508. The actions of defendants DeAngelo, Reddinger, and Bell in searching and reading plaintiff's outgoing legal mail constituted the tort of negligence under the law of Pennsylvania.

509. The actions of defendant DeAngelo in refusing to provide the peanut butter pursuant to plaintiff's medical diet, and in stealing his cup of peaches and replacing it with an empty cup from the garbage can, constituted retaliation for filing a grievance and for complaining to his supervisor about not getting a pink action return receipt for the grievance in violation of the First Amendment to the United States Constitution.

510. The actions of defendant DeAngelo in refusing to provide the peanut butter pursuant to plaintiff's medical diet, and in stealing his cup of peaches and replacing it with an empty cup from the garbage can, deprived plaintiff of basic human necessities and constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

511. The actions of defendant DeAngelo in refusing to provide the peanut butter pursuant to plaintiff's medical diet, and in stealing his cup of peaches and replacing it

with an empty cup from the garbage can, constituted the torts of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under the law of Pennsylvania.

512.    The actions of defendants Yount and Mohoney in conducting an abusive strip search practice were done maliciously and sadistically as harassment and constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

513.    The actions of defendants Yount and Mohoney in conducting an abusive strip search practice were done maliciously and sadistically as harassment, impinged on plaintiff's right of bodily privacy, and constituted an unlawful search and seizure in violation of the Fourth Amendment to the United States Constitution.

514.    The actions of defendants Yount and Mohoney in conducting an abusive strip search practice were done without any penological reason and constituted retaliation for filing and pursuing a prior PREA allegation, for speaking with defendant Laver about that prior PREA allegation, and for filing and pursuing Case. No. 3:23-cv-239 in violation of the First Amendment to the United States Constitution.

515.    The actions of defendants Yount and Mohoney in conducting an abusive strip search practice were done maliciously and sadistically as harassment and constituted a conspiracy to violate plaintiff's First Amendment, Fourth Amendment, and Eighth Amendment rights.

516.    The actions of defendants Yount and Mohoney in conducting an abusive strip search practice were done maliciously and sadistically as harassment and constituted the

torts of intentional infliction of emotional distress and negligence under the law of Pennsylvania.

517.    The actions of defendants Yount and Mohoney in denying plaintiff's visit constituted retaliation for refusing to succumb to defendant Mohoney's sexual demands to "strip again. Put your finger in your asshole," for filing and pursuing a prior PREA allegation, for informing them that he was filing another PREA allegation, and for filing and pursuing Case No. 3:23-cv-239 in violation of the First Amendment to the United States Constitution.

518.    The actions of defendants Yount and Mohoney in denying plaintiff's visit as retaliation constituted a conspiracy to violate plaintiff's First Amendment right.

519.    The actions of defendants Yount and Mohoney in denying plaintiff's visit as retaliation for refusing to succumb to sexual demands constituted the torts of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under the law of Pennsylvania.

520.    The actions of defendants Yount, Mohoney, and Marshal in fabricating a misconduct report against plaintiff constituted retaliation for refusing to succumb to defendant Mohoney's sexual demands to "strip again. Put your finger in your asshole," for filing and pursuing a prior PREA allegation, for speaking with defendant Laver about the prior PREA allegation, for informing them that he was filing another PREA allegation, and for filing and pursuing Case No. 3:23-cv-239 in violation of the First Amendment to the United States Constitution.

521.    The actions of defendants Yount, Mohoney, and Marshal in fabricating a misconduct report against plaintiff as retaliation constituted a conspiracy to violate plaintiff's First Amendment right.

522.    The actions of defendants Yount, Mohoney, and Marshal in fabricating a misconduct report against plaintiff because he refused defendant Mohoney's sexual demands constituted the torts of intentional infliction of emotional distress and negligence under the law of Pennsylvania.

523.    The actions of defendant Muntz in meting out a 60 day punitive segregation sentence, and in denying plaintiff due process, and of defendants Harry, Moslak, Irwin, Blicha, Gustafson, Alexander, and Eisenman in upholding the sentence and denial of due process rights or otherwise refusing to remedy the sentence, and of defendants Muntz, Irwin, Blicha, Eisenman, Gustafson, Alexander, and Yount in destroying, altering, and fabricating the Part 2(B), constituted retaliation for filing a grievance and Case No. 3:23-cv-239 in violation of the First Amendment to the United States Constitution.

524.    The actions of defendant Muntz in meting out a 60 day punitive segregation sentence, and in denying plaintiff due process, and of defendants Harry, Moslak, Irwin, Blicha, Gustafson, Alexander, and Eisenman in upholding the sentence and denial of due process rights or otherwise refusing to remedy the sentence, and of defendants Muntz, Irwin, Blicha, Eisenman, Gustafson, Alexander, and Yount in destroying, altering, and fabricating the Part 2(B), constituted the torts of intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under the law of Pennsylvania.

525.    The actions of defendant Muntz in meting out a 60 day punitive segregation sentence, and in denying plaintiff due process, and of defendants Harry, Moslak, Irwin, Blicha, Gustafson, Alexander, and Eisenman in upholding the sentence and denial of due process rights or otherwise refusing to remedy the sentence, and of defendants Muntz, Irwin, Blicha, Eisenman, Gustafson, Alexander, and Yount in destroying, altering, and fabricating the Part 2(B), constituted a conspiracy to violate plaintiff's First Amendment right.

526.    The actions of defendant Muntz in fabricating the Part 2(B) and finding plaintiff guilty of the misconduct charges in face of video footage showing plaintiff's innocence and the officers' retaliation, and of defendants Muntz, Irwin, Blicha, Eisenman, Gustafson, Alexander, and Yount in destroying, altering, and fabricating the original Part 2(B), and of defendants Harry, Moslak, Irwin, Blicha, Eisenman, Gustafson, and Alexander in upholding or failing to remedy the disciplinary decision, denied plaintiff due process of law in violation of the Fourteenth Amendment to the United States Constitution.

527.    The actions of defendant Muntz in fabricating the Part 2(B) and finding plaintiff guilty of the misconduct charges in face of video footage showing plaintiff's innocence and the officers' retaliation, and of defendants Muntz, Irwin, Blicha, Eisenman, Gustafson, Alexander, and Yount in destroying, altering, and fabricating the original Part 2(B), and of defendants Harry, Moslak, Irwin, Blicha, Eisenman, Gustafson, and Alexander in upholding or failing to remedy the disciplinary decision, constituted a conspiracy to violate plaintiff's Fourteenth Amendment right.

528. The actions of defendant Yount in denying plaintiff a shower constituted retaliation for filing a PREA allegation on him in violation of the First Amendment to the United States Constitution.

529. The actions of defendant Yount in denying plaintiff a shower constituted the tort of negligence under the law of Pennsylvania.

530. The actions of defendant Crose in inhibiting plaintiff's prayers by assaulting him with garbage and by threatening him, and in punching plaintiff's testicles, were done maliciously and sadistically and constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

531. The actions of defendant Crose in inhibiting plaintiff's prayers by assaulting him with garbage and by threatening him, and in punching plaintiff's testicles, substantially burdened plaintiff's religious practice and denied plaintiff his right to free exercise of religion in violation of the First Amendment to the United States Constitution.

532. The actions of defendant Crose in inhibiting plaintiff's prayers by assaulting him with garbage and by threatening him, and in punching plaintiff's testicles, were done maliciously and sadistically and constituted retaliation for sending a complaint to the Inspector General and for threatening to file a grievance in violation of the First Amendment to the United States Constitution.

533. The actions of defendants Pennsylvania Dept. of Corrections and Crose in substantially burdening plaintiff's religious practice by inhibiting plaintiff's prayers by way of garbage assaults and threats to pepper spray and murder him violated 42 U.S.C. § 2000cc, the Religious Land Use and Institutionalized Persons Act.

534.    The actions of defendants Strick, Snyder, Gustafson, Irwin, Smith, and Jordan in denying plaintiff information on his thyroid problem and Tapazole denied plaintiff the right to consent to medical care in violation of the Fourteenth Amendment to the United States Constitution.

535.    The actions of defendants Strick, Snyder, Gustafson, Irwin, Smith, and Jordan in denying plaintiff information on his thyroid problem and Tapazole constituted the tort of negligence under the law of Pennsylvania.

536.    The actions of defendants Strick, Snyder, Gustafson, Irwin, Smith, and Jordan in providing a painful and ineffective course of treatment for Hyperthyroidism or otherwise denying treatment were done maliciously and sadistically and constituted cruel and unusual punishment and deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution.

537.    The failure of defendants Harry, Lowe, Moore, Varner, Irwin, Eisenman, Blicha, Alexander, Gustafson, Moslak, Walker, Weiland, Jordan, Smith, and Bell to maintain adequate policies, adequately train, define expected performance by promulgating rules or otherwise monitor adherence to performance standards, and respond to unacceptable performance whether through individualized discipline or further rulemaking or take other action to curb the known pattern and practice of physical abuse, sexual abuse, deliberate indifference, denying medical information, fabrication of records, and retaliation by the defendants employed at SCI-Forest constituted deliberate indifference to plaintiff's and other prisoners' safety and constitutional rights, and contributed to and proximately caused the above-described violations of First Amendment, Fourth Amendment, Eighth Amendment, and Fourteenth Amendment rights as well as the

above-described torts of intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, and assault and battery.

*Relief Requested*

WHEREFORE, plaintiff requests that the Court grant the following relief:

A. Award compensatory damages jointly and severally against:

1. Defendants Yount, Mowery, Mohoney, Bulers, Bauer, Walker, John Doe #1, John Doe #2, Spencer, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Weiland, and Lowe for the physical and emotional injuries sustained and infringements to First Amendment rights as a result of the plaintiff's retaliatory beating and sexual abuse that occurred on April 25, 2023.

2. Defendants Yount, Mohoney, Irwin, Mowery, Varner, Moore, Alexander, Weiland, Walker, Gustafson, Moslak, Blicha, and Harry for the physical and emotional injuries, loss of liberty, loss of family relationships, infringements to First Amendment rights, and monetary loss resulting from the retaliatory misconduct report fabricated on April 25, 2023.

3. Defendants Yount, Irwin, Munich, Collins, Varner, Moore, Alexander, Gustafson, Blicha, Moslak, and Harry for the physical and emotional injuries, loss of liberty, loss of family relationships, infringements to First Amendment rights, monetary loss resulting from their retaliatory denial of due process and the sentence in connection with plaintiff's disciplinary proceedings conducted on April 28, 2023, and May 12, 2023.

4. Defendants Yount, Munich, Collins, Harry, Moslak, Varner, Moore, Irwin, Blicha, Gustafson, Bell, Alexander, Weiland, Walker, and Lowe for the physical and

emotional injuries and infringements to First Amendment rights resulting from the retaliatory destruction of plaintiff's inmate version form on April 28, 2023.

5. Defendants Strick, Crystal, Watson, John Doe #3, Irwin, Varner, Moore, Harry, Blicha, Jordan, Smith, and Alexander for the physical and emotional injuries resulting from their denial of medical care in connection with the injuries sustained as a result of plaintiff's beating on April 25, 2023.

6. Defendant Laver for the physical and emotional injuries and infringements to First Amendment rights resulting from his retaliatory failure to prevent future harm by his fabrication of a police report and by his failure to have the officers criminally charged.

7. Defendants Bauer, Spencer, John Doe #4, Harry, Varner, Moore, Moslak, Irwin, Blicha, Gustafson, Alexander, Weiland, Eisenman, Walker, Bell, and Lowe for the physical and emotional injuries, infringements to First Amendment rights, and monetary loss resulting from the retaliatory destroying of property and urinating in plaintiff's cell after the interaction with defendant Laver on May 1, 2023.

8. Defendants Bauer, Spencer, John Doe #4, Varner, Moore, Irwin, Moslak, Harry, Blicha, Gustafson, Alexander, Weiland, Walker, Lowe, Bell, and Eisenman for the physical and emotional injuries and monetary loss resulting from the denial of a meaningful, adequate post-deprivation remedy in connection with the destruction of property.

9. Defendants Spencer, Fredrick, John Doe #5, Harry, Irwin, Varner, Moore, Blicha, Gustafson, Alexander, Eisenman, Weiland, Walker, Lowe, and Bell for the

physical and emotional injuries and infringements to First Amendment rights resulting from plaintiff's placement in a broken, fifthly cell on June 6, 2023.

10. Defendants McGill, Varner, Moore, Harry, Blicha, Gustafson, Eisenman, Irwin, and Jordan for the physical and emotional injuries resulting from the denial of medical care for the injuries sustained as a result of the misuse of force on June 6, 2023.

11. Defendants Burkhart, Carbon, John Doe #6, Walker, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Bell, Lesko, Fredrick, and Harry for the monetary loss and emotional injuries resulting from the denial of a meaningful, adequate post-deprivation remedy in connection with the destruction of legal notebooks on June 6, 2023.

12. Defendants Yount, Lowe, Lesko, Harry, Varner, Irwin, Moore, Blicha, Gustafson, Alexander, Eisenman, and Weiland for the physical and emotional injuries and infringements to First Amendment rights resulting from the retaliatory theft of plaintiff's food on November 29, 2023.

13. Defendants Lowe, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, and Weiland for the emotional injuries and infringements to First Amendment rights resulting from defendant Lowe's retaliatory labeling of plaintiff as being a pedophile, his retaliatory denial of TV, and his destruction of the TV remote controls on November 29, 2023.

14. Defendants C.O. Moore, Walker, Lowe, Irwin, Richards, Mowery, Fredrick, Lesko, Crose, Harry, Varner, Moore, Blicha, Gustafson, Alexander, Eisenman, Weiland, and Bell for the physical and emotional injuries, infringements to First

Amendment rights, and loss of family relationships resulting from the retaliatory denials or interferences with the visits on November 23, 2023; November 30, 2023; and January 2, 2024.

15. Defendants Spencer, Fredrick, John Doe #5, Harry, Irwin, Varner, Moore, Blicha, Walker, Gustafson, Alexander, Eisenman, Weiland, Lesko, Lowe, and Bell for the physical and emotional injuries sustained as a result of the retaliatory misuse of force on June 6, 2023.

16. Defendants Burkhart, Carbon, John Doe #6, Walker, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Bell, Lesko, and Fredrick for the emotional injuries and monetary loss and infringements to First Amendment rights resulting from the retaliatory destruction of legal notebooks on June 6, 2023.

17. Defendants Walker, Yount, DeAngelo, Richards, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Lowe, and Bell for the physical and emotional injuries, infringements to First Amendment rights and monetary loss resulting from the retaliatory interference with and destruction of plaintiff's property on February 28, 2024.

18. Defendants Walker, Yount, DeAngelo, Richards, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Lowe, and Bell for the physical and emotional injuries and monetary loss resulting from the denial of due process and a meaningful post-deprivation remedy in connection with the retaliatory destruction of and interference with the plaintiff's property on February 28, 2024.

19. Defendants DeAngelo, Reddinger, Bell, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Walker, and Lowe for the physical and emotional injuries, monetary loss, and infringements to First Amendment rights resulting from the searching and reading of plaintiff's outgoing legal mail on February 28, 2024.

20. Defendants DeAngelo, Harry, Varner, Moore, Irwin, Blicha, Alexander, Gustafson, Eisenman, Weiland, Walker, Lowe, and Bell for the physical and emotional injuries and infringements to First Amendment rights resulting from the retaliatory interference with plaintiff's food on March 26, 2024.

21. Defendants Yount, Mohoney, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Walker, Lowe, Bell, Fredrick, Lesko, and Moslak for the physical and emotional injuries and infringements to First Amendment rights resulting from the retaliatory, abusive strip search on May 1, 2024.

22. Defendants Yount, Mohoney, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Walker, Lowe, Bell, Fredrick, Lesko, and Moslak for the physical and emotional injuries, infringements to First Amendment rights, and loss of family relationships resulting from the retaliatory denial of the visit on May 1, 2024.

23. Defendants Yount, Mohoney, Marshal, Harry, Moslak, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Walker, Lowe, Bell, Lesko, and Fredrick for the physical and emotional injuries, loss of liberty, and infringements to First Amendment rights resulting from the retaliatory misconduct report fabricated on May 1, 2024.

24. Defendants Muntz, Harry, Moslak, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, and Eisenman for the physical and emotional injuries and loss of liberty resulting from the retaliatory punitive segregation sentence, denial of due process, infringements to First Amendment rights, and fabrication of the record in connection with the retaliatory misconduct report and disciplinary hearings.

25. Defendants Yount, Harry, Moslak, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Walker, Lowe, and Bell for the physical and emotional injuries and infringements to First Amendment rights resulting from the retaliatory denial of a shower on May 7, 2024.

26. Defendants Pennsylvania Dept. of Corrections, Crose, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Alexander, Eisenman, Weiland, Walker, Lowe, and Bell for the physical and emotional injuries and infringements to First Amendment rights resulting from the retaliatory garbage assault, threats, and interference with plaintiff's religious practice on June 10, 2024.

27. Defendants Snyder, Strick, Jordan, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Smith, and Eisenman for the physical and emotional injuries sustained from the denial of medical consent relating to plaintiff's thyroid ailment.

28. Defendants Snyder, Strick, Jordan, Harry, Varner, Moore, Irwin, Blicha, Gustafson, Smith, and Eisenman for the physical and emotional injuries sustained from the painful, ineffective treatment with Tapazole or from the denial of treatment for plaintiff's thyroid ailment.

B. Award punitive damages severally against:

1. Defendants Harry, Varner, Moore, Irwin, Moslak, Walker, Gustafson, Blicha, Lesko, Mohoney, Alexander, Eisenman, Weiland, Bell, Lowe, C.O. Moore, Yount, Mowery, Bulers, Bauer, John Doe #1, John Doe #2, Spencer, Crystal, Watson, John Doe #3, Collins, Munich, Laver, John Doe #4, Fredrick, John Doe #5, McGill, Burkhart, Carbon, John Doe #6, Richards, Crose, DeAngelo, Reddinger, Marshal, Muntz, Pennsylvania Dept. of Corrections, Strick, Snyder, Smith, and Jordan (*i.e.* against each and every defendant sued herein) for each and every claim pled in the present complaint; for their reckless, outrageous, reprehensible conduct; and to deter their reckless, outrageous, reprehensible conduct.

C. Grant such other relief as it may appear that plaintiff is entitled.

*Verification*

Pursuant to 28 U.S.C. § 1746, I, David Kauffman, declare and verify, under penalty of perjury, that I have read the foregoing and that it is true and correct to the best of my knowledge and belief.

Respectfully submitted this 10th day of April, 2025.

David Kauffman

11 Forever Lane

Paradise, PA 17562

4/10/25

*Plaintiff, Pro se*